We granted certiorari review in order to determine the following issues: (1) whether Jerry Allen Youngblood voluntarily waived his Miranda rights and (2) whether the trial court can order the court reporter to exercise the State's unused peremptory challenges.
The State's evidence tended to show that on April 8, 1992, Youngblood and his brother entered Dawson's Shirt Shop, located in Montgomery, Alabama. The two men had planned to rob the owner, Eula Mae Dawson, but brought no weapons with them. Mrs. Dawson drew a pistol on the two. While Mrs. Dawson and Youngblood struggled for the pistol, a single shot was fired; that shot struck Mrs. Dawson and she later died from her injuries.
A witness to the crime, Kathleen Rucker, testified that Youngblood and his brother had entered the shop earlier in the day to buy some bubble gum. Later, she said, the two brothers came back to the shop, ostensibly to have a pair of pants repaired. While Youngblood's brother talked with Mrs. Dawson about the pants, Youngblood walked over and demanded that she give him some money. Rucker stated that Youngblood threatened to kill her if she did not comply. Youngblood's brother forced Mrs. Rucker to the floor.
Mrs. Rucker testified that as Mrs. Dawson pulled her pistol out, Youngblood wrested it away from her, threatening her life; during the struggle, the shot was fired. Youngblood took Mrs. Dawson's purse, and the brother took Mrs. Rucker's wallet.
Youngblood was convicted of capital murder and was sentenced to life imprisonment without the possibility of parole. The Court of Criminal Appeals affirmed the conviction.Youngblood v. State, 656 So.2d 385 (Ala.Crim.App. 1993).
Did the trial court err in denying Youngblood's motion to suppress his statements to the police?
Youngblood argues he has a low level of intelligence and a hearing impairment and that those conditions prevented him from making a voluntary, knowing, and intelligent waiver of hisMiranda rights.
The facts surrounding his statements are as follows: Youngblood was arrested approximately one hour after the crime was committed. Corporal G.P. Bellefleur read aloud to him theMiranda rights as they were stated on the back of a card, while looking down at the card and while sitting next to Youngblood in the police car. At police headquarters, Detective K.C. Baldwin read Youngblood his Miranda rights from a printed form. Baldwin then told Youngblood to read aloud the second paragraph of a prepared form, which states "I fully understand the foregoing statement and do willingly agree to answer questions. I understand and know what I am doing. No promise or threats have been made to me by anyone and no pressure of any kind has been made against me by anyone." (C.R. 11.)
Detective Baldwin then asked Youngblood about the incident. Youngblood gave confusing answers to several questions. For example, when asked "Can you describe what she looks like?" Youngblood responded by giving directions to a house. (C.R. 21.) When asked "Is she kinda [sic] heavyset or small or what?" he said "Small hair, not long hair, small hair, black hair." (C.R. 21.) During the interview with Detective Baldwin, Youngblood stated that his brother shot the victim.
Detective Carmichael then entered the office to interrogate Youngblood. Carmichael read Youngblood his Miranda rights. Carmichael then said, "Now, can you hear what I am saying to you? I know you're a little hard of hearing." (C.R. 27.) Carmichael then asked Youngblood to read a statement saying that he understood his rights and was waiving them. Youngblood read the statement out loud and told Detective Carmichael that he understood it.
Detective Carmichael then asked Youngblood about the incident. Youngblood told Carmichael that he, not his brother, shot the victim. Carmichael then read Youngblood hisMiranda rights again. Subsequently, the police made a videotape of Youngblood, during *Page 392 
which he repeated his statement for the police.
Dr. Karl Kirkland, a licensed psychologist, interviewed Youngblood for the purpose of assessing his competency to stand trial and his mental state at the time of the alleged crime. Dr. Kirkland testified that Youngblood had an IQ between 50 and 68. (R.T. 92.) He testified that Youngblood could read on a third- or fourth-grade level and that his IQ was borderline normal. Dr. Kirkland found, based on all the circumstances, that Youngblood had the mental capacity to knowingly, intelligently, and voluntarily waive his Miranda rights.
The trial court's findings on a motion to suppress will not be disturbed on appeal unless they are clearly erroneous.Ex parte Matthews, 601 So.2d 52 (Ala.), cert. denied,505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992). While a defendant's mental condition may be a significant factor in determining the "voluntariness" of a confession, this factor alone does not justify a conclusion that the mental condition, apart from its relation to any alleged coercion by police, should dispose of the voluntariness issue. Colorado v.Connelly, 479 U.S. 157, 164-66, 107 S.Ct. 515, 520-21,93 L.Ed.2d 473 (1986).
After reviewing the record, we agree that the trial court did not err in finding that Youngblood voluntarily waived his rights under Miranda. The State presented expert testimony indicating that Youngblood was capable of waiving his rights. The State also presented testimony, from the police officers involved, that Youngblood seemed to understand his rights and that he subsequently waived them. Although Youngblood argues that his low mental capacity made him incapable of understanding his rights guaranteed by Miranda v. Arizona,384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), this factor alone is insufficient to require such a finding.
Youngblood argues that his hearing impairment rendered his confession involuntary, because, he argues, that impairment caused him to be not adequately informed of his rights. Youngblood does have a hearing impairment; it requires him to read lips in order to communicate effectively. However, Youngblood was asked on two separate occasions to read a paragraph stating that he understood his rights, and he did so. The following exchange occurred immediately after Detective Carmichael read Youngblood his Miranda rights:
 "Carmichael: If you want to answer questions now you can do so, but you can stop answering at any time. Now, can you hear what I'm saying to you? I know you are a little hard of hearing.
"Youngblood: Yes, sir.
"Carmichael: Okay, you heard what I said?
"Youngblood: Yes, sir.
 "Carmichael: Okay, I want you to read that paragraph back to me if you will please?
 "Youngblood: 'I full understand the foregoing statement, and do willingly agree to answer questions. I understand and know what I am doing. No promise or threatening have been made to me by anyone, and no pressure of any kind have been made against me by anyone.'
"Carmichael: Do you understand what that means?
"Youngblood: Yes, sir.
 "Carmichael: Nobody's promised you anything, nobody's threatened you to give this statement."
"Youngblood: No, sir."
(C.R. 26-27.)
Youngblood failed to present evidence that his hearing impairment or mental capacity prevented him from understanding the rights read to him. Therefore, the trial court did not err in denying Youngblood's motion to suppress the statements he made to the police.
Did the trial court err in ordering the court reporter to exercise three peremptory challenges on behalf of the State?
During the selection of the jury, the trial court informed counsel for the parties that each side had 16 strikes. After exercising 13 strikes, the State tendered its two remaining strikes and its one alternate strike to the trial court. Youngblood objected. The trial *Page 393 
court then ordered the court reporter to strike the jurors on behalf of the State. Youngblood did not at that time object on the basis that that procedure violated Batson v. Kentucky,476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The jury was sworn in and was seated.
The court then heard arguments on several motions, including Youngblood's motion to suppress his statements to the police, which was overruled. Youngblood then made a Batson motion. The State objected, arguing that the motion was not timely. The court noted that the motion was not timely and said that even if it had been, Youngblood had made no prima facie showing of racial discrimination, because there were five African-Americans on the jury.
Youngblood argues that the State's tender of its remaining peremptory challenges to the trial court and the trial court's subsequent order directing the court reporter to exercise the State's peremptory challenges was reversible error. Youngblood argues that the Rules of Criminal Procedure and the jury selection statutes contain no provision for the State's failure or refusal to exercise a peremptory challenge. Additionally, he argues, the rules do not provide that the judge may delegate his authority to exercise an unused peremptory challenge.
Rule 18.4(f), Ala.R.Crim.P.,[1] provides that after voir dire examination has been completed and challenges for cause have been exercised, "[t]he district attorney shall strike first, and shall strike from the list the name of one (1) juror; the defendant shall next strike the name of one (1) juror. They shall continue to strike off names alternately until only twelve (12) jurors remain on the list, and the twelve (12) thus selected shall be the jury charged with the trial of the defendant."
 "If any defendant should fail or refuse to exercise a strike to which he is entitled, then the judge presiding shall exercise that defendant's strike for him or her."
Rule 18.4(f)(3), A.R.Crim.P.
Youngblood argues that any violation of the statutory scheme or scheme set up by the rules for excusing jurors constitutes reversible error. In Slaton v. State, [Ms. CR-89-848, September 30, 1993] ___ So.2d ___ (Ala.Crim.App. 1993), the trial judge's secretary excused prospective jurors from the venire. Section 12-16-74, Ala. Code 1975, provides that the trial judge may excuse prospective jurors from serving on the venire. The trial judge may also designate a court official to disqualify or excuse a prospective juror or to postpone someone's juror service. § 12-16-145, Ala. Code 1975. The Slaton court remanded the case for a determination of whether the trial judge had "designated" his secretary as the person having the authority to excuse potential jurors.
In Windsor v. State, [Ms. CR-91-1487, August 13, 1993] ___ So.2d ___ (Ala.Crim.App. 1993), the Court of Criminal Appeals held that the circuit clerk's excusal of potential jurors from jury duty violated the statutory provisions relating to the summoning of jurors and that that violation entitled the defendant to a new trial. The court stated that a violation of the jury selection and qualification statutes "always constitutes reversible error because a violation of those statutes impinges the integrity of the jury selection process." ___ So.2d at ___.
The State sought certiorari review of the Court of Criminal Appeals' holding in Windsor, and this Court held that the practice of allowing employees in the circuit clerk's office to excuse potential jurors was not "a usurpation of authority, but, instead, [was] the natural result of an attempt to conform to the spirit if not the letter, of the [jury selection and qualification] statutes." Windsor v. State, [Ms. 1930048, February 18, 1994] ___ So.2d ___ (Ala. 1994).
In Pettway v. State, 624 So.2d 696 (Ala.Crim.App. 1993), a case similar to Youngblood's, the trial court exercised the State's last three peremptory challenges. The defendant argued that the trial court's exercise of the State's peremptory challenge undermines public confidence in judicial proceedings, especially when the State has failed to *Page 394 
exercise its peremptory challenges on the basis that it cannot exercise racially neutral strikes. The Court of Criminal Appeals held that while the trial court's exercise of the State's peremptory challenges was "highly questionable," the defendant had failed to show prejudice under Batson. The court noted that nothing in the record indicated whether the trial court's strikes were against blacks or were against whites and that the defendant had not alleged that the trial court had engaged in purposeful discrimination.
At the outset, we note that the State's refusal to exercise its peremptory challenges does not relieve the State of its duty to comply with the holding in Batson. The United States Supreme Court held in Batson that the exercise of racially discriminatory challenges offends the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution when those challenges are made by the State. The prohibition against using racially motivated peremptory challenges has been extended to the defendant in criminal cases by Georgia v.McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), and to private litigants in civil cases by Powers v. Ohio,499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1990).
This Court concludes that regardless of whether the trial judge or court personnel acting under the trial court's direction exercise a peremptory challenge, if the challenge is used to strike a potential jury member based solely on race then the Equal Protection Clause has been violated, because discriminatory challenges harm the individual juror by subjecting him or her to open and public racial discrimination and harm the community by undermining its confidence in the justice system. This is true whether the trial court is striking potential jurors on behalf of the defendant pursuant to Rule 18.4 or on behalf of the State.
In this case nothing in the record indicates how the court reporter exercised the peremptory strikes on behalf of the State. Indeed, Youngblood does not argue on appeal that there was a violation of Batson. The crux of his argument is that any
deviation from the statutory or rules scheme regarding the jury selection process is always reversible error.
Youngblood correctly states that nothing in the Rules of Criminal Procedure provides for the State's refusal to exercise peremptory challenges and that nothing in those rules allows the trial court to delegate to court personnel its authority to exercise strikes on behalf of the defendant. The State's tender of its remaining peremptory challenges to the trial court and the trial court's subsequent delegation of those strikes to the court reporter did not comport with the Rules of Criminal Procedure. However, this error was harmless, because there was no violation of Batson.
The judgment is affirmed.
AFFIRMED.
ALMON, HOUSTON and COOK, JJ., concur.
INGRAM, J., concurs in the result.
[1] Rule 18.4 superseded § 12-16-100, Ala. Code 1975. It basically incorporates the provisions of that Code section, with some modification.