[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 489 
This case was originally assigned to another judge. It was transferred to Judge Cobb on June 11, 1997.
Michael Shawn Barnes appeals from two convictions of capital murder and a sentence of death by electrocution in connection with the killing of Mrs. Aileen Meinhardt. On October 18, 1995, Michael Shawn Barnes was convicted of two counts of murder made capital because Mrs. Meinhardt's murder was committed during a burglary in the first degree, see § 13A-5-40(a)(4), Ala. Code, 1975; and because Mrs. Meinhardt's murder was committed during a rape in the first degree, see § 13A-5-40(a)(3), Ala. Code 1975. On December 12, 1995, the court conducted a sentencing hearing for both this instant case and a separate, unrelated, capital murder conviction for the murder of John Cimprich.[1]
Barnes was sentenced to death on both counts of capital murder involving Mrs. Meinhardt.
Testimony given at trial revealed that Aileen Meinhardt was last seen alive between 7:00 p.m. and 8:00 p.m. on December 6, 1993. On December 7, neighbors became concerned when they noticed that Mrs. Meinhardt had not raised the window shades in the house, as was her custom, and that the door of her automobile was open. Upon approaching the house, neighbors heard a smoke alarm sounding. One neighbor entered the house and saw smoke in Meinhardt's bedroom. He then telephoned 911 to report a fire.
When the fire department and Corporal Daniel Walker, a Saraland policeman, arrived at Meinhardt's house, the firemen and Corp. Walker went to the bedroom in the back of the house where the neighbor had seen the smoke. They discovered Meinhardt's severely burned body. Her wrists had been tied to the bedposts. Also found on the bed were sheets of charred paper that had been torn from books found in the house, and an electrical appliance, the cord from which was wrapped around Meinhardt's neck.
Dr. Gregory P. Wanger, a medical examiner for the Alabama Department of Forensic Sciences, observed portions of the autopsy performed on Mrs. Meinhardt. He testified that the causes of Meinhardt's death were strangulation, smoke inhalation, and burns. Dr. Wanger explained that the presence of soot in Meinhardt's windpipe indicated that *Page 490 
she was still breathing when the fire was set in her bedroom. Other evidence introduced at trial indicated that Meinhardt had been sexually assaulted shortly before her death.
The State presented evidence that tended to show that Barnes had burglarized Meinhardt's house and had raped her before she was killed. Barnes's statements to the police, in which he admitted burglarizing Meinhardt's house, were introduced at trial. Fingerprints taken in Meinhardt's house were also determined to have been left by Barnes. Additionally, the State presented expert testimony regarding DNA from vaginal swabs taken during Meinhardt's autopsy that strongly suggested that Barnes had had sexual intercourse with Meinhardt.
Sue Rogers, a scientist at the Alabama Department of Forensic Sciences, testified that the DNA samples taken from the swabs were identical in each of six tested characteristics to a known DNA sample from Barnes. Rogers then testified that population frequency statistics indicated that 99.91439% of the population of Alabama would have a different combination of those six characteristics than the DNA samples taken from the swabs and from Barnes.
The principal theory of Barnes's defense was that, while he was present during the burglary, he had no part in her murder. He alleged that two accomplices in the burglary murdered Meinhardt while he was in a different part of the house and that he was unaware that they had done so. However, no evidence corroborating the involvement of any accomplices was found during the investigation.
Although Barnes raises seven issues in his brief to this Court, our disposition of the case requires that we address only two of these. In section III of this opinion, below, we address two additional issues raised by our review of the record.
 I.
Barnes alleges that the trial court committed reversible error in admitting into evidence statements he made to Saraland detectives following his arrest. Barnes alleges that the statements were improperly admitted because he was detained at the Saraland Police Department for approximately 11 hours before he was transported to a youth detention facility in violation, he says, of the statute requiring that juveniles be transported with all possible speed to a juvenile detention center after their arrest, § 12-15-58(a), Ala. Code 1975. Barnes additionally alleges that the statements were made involuntarily to police after he was read his juvenile rights as dictated by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694 (1966), and Rule 11(B), Ala. R. Juv. P., because, he says, he was unable to comprehend his rights and because the police failed to act on his request to speak to his mother. We find both of these arguments to be without merit.
 A.
Barnes was 17 years old at the time of his arrest on January 4, 1994. Uncontroverted testimony established that Barnes was arrested at approximately 4:45 p.m. He arrived at the Saraland Police Department at approximately 5:30 p.m. From approximately 5:30 p.m. until 10:16 p.m., Barnes was questioned regarding his possible involvement in several burglaries in the area around his house and at the Saraland Civic Center. For approximately one hour, two sets of major case fingerprints, including palm and fingertip prints, were taken from Barnes. During this time he was provided with food. At 10:16 p.m., Chris Galanos, then district attorney for Mobile County, arrived at the police station and read Barnes his juvenile Miranda rights before detectives began questioning Barnes regarding the Meinhardt or Cimprich murders. At approximately 10:30 p.m., Detective James A. Cooper of the Saraland Police Department began questioning Barnes. Between approximately 10:30 p.m. and 3:18 a.m. the next day, Barnes gave several statements regarding the two murders. He was again provided food during this time. Barnes was then transported to a youth detention facility, where he arrived at approximately 5:00 a.m.
Section 12-15-58, Ala. Code 1975, provides, in pertinent part:
 "(a) A person taking a child into custody shall, with all possible speed, and in accordance *Page 491 
with this chapter and the rules of court pursuant thereto:
". . . .
 "(3) Bring the child, if not released, to the intake office of probation services or deliver the child to a place of detention or shelter designated by the court. . . ."
This Court has previously held that § 12-15-58 does not prevent investigating officers from questioning a juvenile about a crime.
 " '[N]othing in Code 1975 § 12-15-58 et seq., precludes the transport of an arrested juvenile to a police department first before transfer to a juvenile facility.' Ex parte Talley, 483 So.2d 1372
(Ala. 1986). 'Alabama has no prohibition against a law enforcement officer arresting a juvenile for a delinquent act and taking the juvenile to the police station before the juvenile is either released or taken to probation services or an authorized detention facility.' Talley v. State, 483 So.2d 1369, 1371 (Ala.Cr.App. 1985), cert. quashed, Ex parte Talley, 483 So.2d 1372 (Ala. 1986). 'We do not think that the purpose of the "with all possible speed" requirement of Section 12-15-58 is to immunize juveniles from investigation and interrogation or erect a shield between minors and law enforcement officers.' [Whisenant v. State, 466 So.2d 995, 1005
(Ala.Cr.App. 1984) rev'd on other grounds, 466 So.2d 1006 (Ala. 1985)]. . . ."
Chambers v. State, 497 So.2d 607, 610 (Ala.Cr.App. 1986).
 "Section 12-15-58 refers to 'all possible speed.' The word 'possible' is 'also sometimes equivalent to "practicable" or "reasonable," as in some cases where action is required to be taken "as soon as possible" ' Black's Law Dictionary 1049 (5th ed. 1979). The phrase 'as speedily as possible' means within a reasonable time or without unreasonable delay, having regard to all the circumstances of the case and the things to be done. Tatum v. Levi, 117 Cal.App. 83, 3 P.2d 963, 967 (1931); 4 Words and Phrases As Speedily As Possible 593-94 (perm. ed. 1969).
Whisenant, 466 So.2d at 1005.
Because the facts of the case are not in dispute with regard to the length of time Barnes was held at the police station before he was transferred to a youth detention facility, we review de novo the trial court's ruling with regard to this allegation in Barnes's motion to suppress. State v. Hill,690 So.2d 1201 (Ala. 1996).
After reviewing the record of the suppression hearing and the evidence presented at that hearing, we conclude that Barnes was not held by police investigators for an unreasonable length of time before being transferred to the youth detention facility. Barnes was a suspect in two separate capital murders, in addition to a number of unsolved burglaries in the area. Fingerprints and photographs were taken as standard procedure in the investigation. Our review of the transcripts and videotapes of Barnes's statements, which were introduced at the suppression hearing, reveal that he was alert and cooperative during the statements he gave immediately before he was transported to the youth detention facility; that he answered the investigators questions at length during the statements with minimal prompting by the investigating officers; and that he sketched maps of the crime scenes after being asked to do so. The videotaped statements do not at all suggest the scenario, which Barnes presents, of a lengthy and forceful interrogation followed by an involuntary confession.
Part of the time at the police station was spent waiting on District Attorney Galanos to arrive so that Barnes's juvenileMiranda rights could be fully explained. He was provided with food on at least two occasions during the time he was at the Saraland police station. At the completion of his questioning, Barnes was immediately transferred to a youth detention facility. Again, we hold that § 12-15-58 does not prevent law enforcement officers from questioning or interrogating a juvenile suspected of criminal activity. The facts of the instant case well illustrate the reason we will not place an absolute upper limit on the amount of time a juvenile may be questioned by investigators regarding suspected criminal activity before being taken to a youth detention facility. *Page 492 
Under the circumstances, Barnes was not detained at the police station for an unreasonable time.
The trial court committed no error in denying Barnes's motion to suppress based on the alleged unreasonableness of the time he was in custody before being transferred to the youth detention facility.
 B.
Barnes alleges that the trial court erred in denying his motion to suppress evidence of his statements to the police on the grounds that, based on the totality of the circumstances surrounding them, they were involuntary. We disagree.
While it is uncontradicted that Barnes was read the juvenileMiranda rights and that he signed waivers of those rights on two separate occasions, he maintains that his statements were involuntary because, he says: (1) he was unable to understand his rights because his IQ was tested at 78 (full-scale score based on a verbal score of 72 and a performance score of 98); (2) he was unable to understand his rights because of a diagnosed organic brain disorder that adversely affected his cognitive abilities; and (3) he is hearing impaired and did not have his hearing aids at the police station. Barnes also alleges that Saraland police refused his request to speak with his mother.
The standard of review when there is conflicting evidence at a hearing on a motion to suppress evidence of a confession is whether the trial court's decision was "manifestly contrary to the great weight of the evidence". Ex parte Matthews,601 So.2d 52, 54-55 (Ala.), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996,120 L.Ed.2d 872 (1992). We will not disturb the trial court's decision on the voluntariness of a confession unless it is clearly erroneous. Ex parte Youngblood, 656 So.2d 390, 392
(Ala. 1995).
Detective James Cooper testified that Barnes appeared to understand his juvenile Miranda rights when they were read to him, both at the time of his arrival at the police station and when then-District Attorney Galanos explained them to him before he was questioned regarding the murders. Cooper also testified that Barnes seemed to be able to hear and understand questions by the investigators and that he was able to answer those questions without difficulty. Judge Chris N. Galanos, who was the Mobile District Attorney at the time of Barnes's arrest and who explained Barnes's juvenile Miranda rights to him before his statements relating to the murders, testified that although he suspected Barnes might have been "a little slow," he appeared to understand his rights as well as the rights that he would waive by giving statements.
Barnes presented the testimony of Dr. Dennis E. Breiter, a clinical psychologist, regarding his mental condition. Breiter testified that, in his opinion, Barnes's low IQ, combined with an organic brain disorder that affected the way Barnes processed information and his hearing impairment, prevented him from understanding his juvenile Miranda rights. Barnes's grandfather, William G. Barnes, Sr., testified that his grandson's mental condition and his hearing problem caused him to have difficulties understanding what was told to him. Barnes also testified that he did not understand his rights when they were read to him after his arrest.
We note first that Barnes did not admit to committing either murder in any of his statements to law enforcement officers. In each statement, he either denied any participation in the events surrounding the murders, blamed someone else for the murders, or admitted to being present at the scene but denied any involvement.
"While a defendant's mental condition may be a significant factor in determining the 'voluntariness' of a confession, this factor alone does not justify a conclusion that the mental condition, apart from its relation to any alleged coercion by police, should dispose of the voluntariness issue."Youngblood, 656 So.2d at 392, citing Colorado v. Connelly,479 U.S. 157, 164-66, 107 S.Ct. 515, 520-21, 93 L.Ed.2d 473 (1986). The testimony presented by both parties at the suppression hearing and the trial court's opportunity to observe Barnes when he testified on his behalf at the hearing was sufficient basis for the trial court's determination that Barnes *Page 493 
was capable of understanding his rights despite his mental and physical disabilities.
Barnes testified at the suppression hearing that he told a police officer upon arriving at the Saraland police headquarters that he wanted to speak with his mother and was told that he could not speak with her. Barnes also testified that Detective Cooper threatened to lock him up in the Saraland jail if he did not tell them about the case and that he would be able to go home if he cooperated.
Detective James Cooper testified that he drove the patrol car in which Barnes was transported from the scene of his arrest to the police station. Cooper testified that Barnes was not asked any questions on the way to the police station. Cooper testified that he remained with Barnes at the police station upon their arrival and that he was with Barnes for virtually the entire time Barnes was at the police station. Cooper testified that Barnes never asked to speak to his mother while he was at the police station. Additionally, Cooper testified that Barnes answered no when asked if he wanted anyone in his family contacted. Cooper testified that while being transported to the juvenile detention facility after questioning had ceased and his statements had been given, Barnes asked if the police were going to telephone his mother. Cooper also denied threatening Barnes to obtain his statement or otherwise promising Barnes anything in return for his statement.
Absent clear error, the trial court's decisions regarding the credibility of witnesses at a suppression hearing are binding on this Court. Walker v. State, 551 So.2d 449, 451 (Ala.Cr.App. 1989). There is no clear error in the record with regard to the trial court's decision on the conflicting testimony of Barnes and Cooper regarding Barnes's alleged request to speak with his mother and the denial of that request and any coercion in securing his statements by the police.
Based on above, we hold that the trial court did not err in denying Barnes's motion to suppress his statements to law enforcement officers.
 II.
At trial, the State introduced evidence and testimony relating to a vaginal swab taken from Meinhardt's body during an autopsy performed by Dr. Leroy Riddick of the Alabama Department of Forensic Sciences. Laboratory analysis of the swab after the autopsy indicated the presence of semen. DNA taken from the swab was compared with DNA from a sample of Barnes's blood. Sue Rogers of the Alabama Department of Forensic Sciences testified that she performed the DNA testing of the two specimens and that they were identical with regard to each of six characteristics tested. The DNA test results, when compared to Alabama population frequency statistics, illustrate that there is a 99.91439% likelihood that any other person who could have committed the rape would have a different DNA profile than Barnes's.
Dr. Riddick, who allegedly gathered the specimen from Meinhardt's body during the autopsy, did not testify at trial. The State instead called Dr. Wanger of the Alabama Department of Forensic Sciences to testify with regard to the autopsy. Wanger testified that Dr. Riddick was on annual leave at the time of trial and in Arizona en route to a National Association of Medical Examiner's meeting in San Diego, California. Wanger testified that he had watched portions of the autopsy performed by Dr. Riddick and that he saw the condition of Meinhardt's body and knew the causes of her death. However, Wanger testified that he did not see Riddick take the vaginal swabs and other specimens from Meinhardt's body. Wanger also testified that he did not see Dr. Riddick's preparation of microscope slides from the swabs before they were sent to the laboratory for analysis.
Wanger's testimony that the swabs were taken from Meinhardt's body was based on his review of a "DFS-1 form," which, he testified, was a receipt customarily prepared by pathologists who performed autopsies for the Department of Forensic Sciences. The purpose of the form, Wanger testified, was to aid in determining who had handled the specimens through the various stages of testing. *Page 494 
At trial Barnes made the following objection to Wanger's testimony regarding the specimens:
 "Q [Ms. Davis, prosecutor]: And what specimens from Mrs. Meinhardt were transferred to other departments?"
 "MR MADDEN [defense counsel]: Your Honor, I object. It's hearsay. This witness didn't prepare the form, and apparently he's being asked to review something that was done by other people. We need the people who did it, not the person who reviewed what they did."
 "THE COURT: Okay. Would you restate the question? I'm not sure I understood it."
 "Q: Did you review the forms as it pertains to the transfer of evidence from Mrs. Meinhardt?"
"A [Dr. Wanger]: Yes ma'am, I did."
(R. 313.) (Emphasis added.)
The trial court then admitted into evidence Wanger's testimony relating to the specimen taken from Meinhardt's body pursuant to the business records exception to the hearsay rule, which is codified at § 12-21-43, Ala. Code 1975.
The State argued that the swabs would be admissible because the DFS-1 form was sufficient to establish Dr. Riddick's handling of the swabs and to establish a proper chain of custody. In the alternative, the State cited § 12-21-13, Ala. Code 1975, in support of its argument that the failure to prove the chain of custody of the vaginal swabs did not render them inadmissible. Section 12-21-13 provides:
 "Physical evidence connected with or collected in the investigation of a crime shall not be excluded from consideration by a jury or court due to a failure to prove the chain of custody of the evidence. Whenever a witness in a criminal trial identifies a physical piece of evidence connected with or collected in the investigation of a crime, the evidence shall be submitted to the jury or court for whatever weight the jury or court may deem proper. The trial court in its charge to the jury shall explain any break in the chain of custody concerning the physical evidence."
The facts in the instant case present a confrontation clause problem regardless of whether the chain of custody of the swabs was established.
Barnes argues that because Dr. Riddick collected the evidence, his presence at trial was necessary. Although Barnes's objection was labeled as a "hearsay objection" and was treated by the trial court only as a hearsay objection, Barnes mainly objected to the introduction of the evidence regarding the autopsy specimens without the testimony of Dr. Riddick. Barnes argues that he should have been able to confront and question Dr. Riddick regarding the specimens before they were introduced because Dr. Riddick was the person who actually collected the specimens. We agree.
The Confrontation Clause, found in the Sixth Amendment to the United States Constitution, provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The United States Supreme Court "has emphasized that the Confrontation Clause reflects a preference for face-to-face confrontation at trial and that 'a primary interest secured by [the provision] is the right of cross-examination." ' Ohio v. Roberts, 448 U.S. 56,63, 100 S.Ct. 2531, 2537, 65 L.Ed.2d 597 (1980), quotingDouglas v. Alabama, 380 U.S. 415, 418, 85 S.Ct. 1074, 1076,13 L.Ed.2d 934 (1965) (footnote omitted). This Court has previously held that "evidence which would normally be admissible under an exception to the hearsay rule may still be inadmissible because it violates the confrontation clause of the Sixth Amendment." Grantham v. State, 580 So.2d 53, 55
(Ala.Cr.App. 1991).
 " 'In Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the Supreme Court "announced that confrontation clause analysis should proceed case-by-case under a two-track approach that tests the necessity and reliability of the contested testimony." United States v. Perez, 658 F.2d 654 at 660 (9th Cir. 1981) (citing Roberts, 448 U.S. at 65-66, 100 S.Ct. at 2538-39). The first consideration is the "rule of necessity" established by the sixth amendment. Roberts, 448 U.S. at 65, *Page 495 100 S.Ct. at 2538. "In the usual case . . . the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant." Id. This necessity requirement is not "absolute." Perez, 658 F.2d at 661. The government is not required to produce a seemingly available witness when the "utility of trial confrontation [is] remote." Roberts, 448 U.S. at 65 n. 7, 100 S.Ct. at 2538 n. 7. Furthermore, "[t]estimony that is neither 'crucial' to the prosecution nor 'devastating' to the defendant might not be subject to the necessity requirement." Perez, 658 F.2d at 661 (citing Dutton v. Evans, 400 U.S. 74 at 87, 89, 91 S.Ct. 210 at 219, 220, 27 L.Ed.2d 213
(1970)). If the government establishes the unavailability of the witness, Roberts then requires that the declarant's statement bear adequate "indicia of reliability." Roberts, 448 U.S. at 66, 100 S.Ct. at 2539.' "
Grantham 580 So.2d at 55-56 (quoting United States v.McClintock, 748 F.2d 1278, 1291-92 (9th Cir. 1984), cert. denied, 474 U.S. 822, 106 S.Ct. 75, 88 L.Ed.2d 61 (1985)).
In Grantham we held that the trial court had improperly admitted a toxicologist's report identifying a substance seized from the defendant as marijuana over the defendant's objections that the person who had prepared the report was not at trial to testify because the report was "crucial" to the prosecution and "devastating" to Grantham. Id. at 56. In Grantham we noted the concerns raised by the Second Circuit Court of Appeals inUnited States v. Oates:
 "In addressing the application of the confrontation clause, the [Oates] court noted that the defendant could have cross-examined the chemist as to his 'personal qualifications and experience,' and also as to 'whether the tests . . . performed . . ., which were not "mere routine recordation[s] of facts," were correctly performed[;] whether the procedures and analyses used are recognized in the profession as being reliable, and if so, how reliable] and whether any machines used were in good working order.' "
Grantham 580 So.2d at 56 (quoting United States v. Oates,560 F.2d 45, 81-82 (2d Cir. 1977) (holding that the introduction of a chemist's report identifying a white powder seized from the defendant as heroin was improper in light of the fact that the chemist who prepared the report did not testify at trial)).
This Court has also held that a certified copy of a death certificate, which would ordinarily be admissible as evidence of the facts therein, could not "be used as the sole evidence in a criminal prosecution for murder to prove the cause of death where live witnesses are available to the State, but are not used for that purpose." Lowery v. State, 55 Ala. App. 514,520, 317 So.2d 365, 371 (Ala.Cr.App.), cert. denied, 294 Ala. 763, 317 So.2d 372 (1975). The Lowery opinion further stated:
 "The burden of proof in all criminal prosecutions rests upon the State, with the presumption of innocence attending the defendant until the burden of proof has been met. To allow the State to simply introduce a certified copy of a death certificate and thus shift the burden to the defendant to disprove the facts set out therein would be an unconstitutional burden of such weight as to deprive a defendant of a fair trial and due process of law.
 "By use of certified copies of business documents and official records under special statutes providing for such, it could be conceivable that the State could prove some offenses without the necessity of calling any witnesses at all, except for the guarantees of our state and federal constitutions. The right of a defendant to be confronted by witnesses against him, includes the right of cross examination."
Lowery v. State, 55 Ala. App. at 520-21, 317 So.2d at 371.
This Court has also found that a trial court committed reversible error when, during a juvenile transfer hearing, it allowed the admission of a fingerprint report comparing fingerprints lifted from the scene of the crime with the defendant's known prints when the defendant was not allowed to confront and cross-examine the officer who lifted the prints from the crime scene, the evidence technician who compared the prints, or the person who created the report. D.D.P. v. State,595 So.2d 528 (Ala.Cr.App. 1991). *Page 496 
In the instant case, as in those discussed above, the evidence admitted over the defendant's objection was found to be both "crucial" to the State's case and "devastating" to the defense. The introduction of the specimens taken during Meinhardt's autopsy was absolutely crucial to the State's case. The DNA evidence that was obtained from the vaginal swab was used at trial to eliminate all but an infinitesimal possibility that someone other than Barnes raped Aileen Meinhardt. The DNA evidence also refuted Barnes's defense that he was in the house at the time of Meinhardt's murder, but that he was not involved in her killing. The swab, in itself, was crucial evidence that Meinhardt had been raped; without that evidence, Barnes could not have been convicted of capital-murder arising out of a rape.
Barnes was denied the ability to question, in any way, the person who took the specimens from which the devastating DNA evidence was taken. The "DFS-1" form, signed by Dr. Riddick, indicated only that he had taken certain specimens from Meinhardt's body. Yet that form was effectively substituted for Dr. Riddick's testimony, and any cross-examination Barnes may have attempted was prevented. The detailed testimony of Sue Rogers, who performed the DNA testing, regarding the precautions taken at the DNA testing laboratory to ensure that specimens are not contaminated served to further illustrate the problems caused by Barnes's inability to cross examine Dr. Riddick on the taking and handling of the specimen during the autopsy. It cannot be said that the usefulness to the defense of confronting Dr. Riddick at trial was so remote that his presence was not required.
"[A] witness is not 'unavailable' for purposes of . . . the exception to the confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial." Barber v. Page, 390 U.S. 719,724-25, 88 S.Ct. 1318, 1321-22, 20 L.Ed.2d 255 (1968) (emphasis in original). The State made no attempt, before the introduction of the testimony regarding the collection of autopsy specimens, to show that Dr. Riddick was unavailable to testify at trial.[2] Additionally, there is nothing in the record to indicate that the State made any effort to secure his presence at trial. The testimony that Riddick was on annual leave was introduced after Barnes's objection to Wanger's testimony regarding the autopsy specimens. Moreover, even if the State had attempted to make a showing that Riddick was "unavailable", we would have found that the reason given for Riddick's absence has been found to be without merit. In Rousev. State, 548 So.2d 643 (Ala.Cr.App. 1989), the State attempted to introduce transcripts of sworn testimony given by a state medical examiner at Rouse's prior trial for the same offense to establish the murder victim's cause of death. In Rouse, the medical examiner, Dr. Lauridson, was out of state on vacation and had no knowledge of the subpoena issued for his testimony at trial. This Court stated:
 "[W]e conclude that the prosecution failed to meet its burden of demonstrating that Dr. Lauridson was constitutionally unavailable for purposes of appellant's trial. The witness was only temporarily absent from the state, and no real effort was made by the state to locate the witness and get him back for the trial. . . . In our opinion, the prosecution did not make a good faith effort to obtain the presence of the witness. 'The constitutional right of confrontation and cross-examination cannot be sidestepped because it happens to be convenient for one of the parties.' Holman v. Washington, 364 F.2d 618, 628 (5th Cir. 1966). Mere absence does not establish unavailability. Williams v. Calloway, 281 Ala. 249, 201 So.2d 506 (1967) . . ."
Rouse, 548 So.2d at 646 (citations omitted).
"Violations of the confrontation clause, like many other constitutional errors, are subject to a harmless error analysis." Grantham, 580 So.2d at 58 (citing Delaware v. VanArsdall, 475 U.S. 673, 680-84, 106 S.Ct. 1431, 1435-38,89 L.Ed.2d 674 (1986)). However we cannot find that the introduction *Page 497 
of the specimens taken at Meinhardt's autopsy was harmless beyond a reasonable doubt. Hutcherson v. State, 677 So.2d 1174
(Ala.Cr.App. 1994). As we have already stated, the DNA evidence gathered from those same samples proved to be devastating. The trial court committed reversible error in admitting the samples without allowing Barnes the opportunity to cross-examine Dr. Riddick.
Although the introduction of the DNA evidence was offered mainly to prove the rape element of the Barnes's rape-murder charge, the strong suggestion that Barnes had been in physical contact with Meinhardt was devastating to his defense of the burglary-murder charge as well. The main theory of Barnes's defense was that while he was present in Meinhardt's house and did, in fact, commit a burglary, he had no knowledge of, nor involvement in, her murder. The improper admission of the DNA evidence was highly prejudicial to Barnes's defense of both charges.
Although we must reverse the trial court's judgment because of reversible error in allowing the admission of the autopsy specimens in Dr. Riddick's absence, we will address other issues that may be presented to the trial court in future proceedings.
 III.
Our review of the record indicates that the State was allowed to introduce DNA evidence after allowing the foundation for such evidence to be presented at trial and in front of the jury. During the testimony of Sue Rogers, Barnes made a hearsay objection to Rogers's testimony that the data used to compile Alabama's population frequency statistics, upon which her opinions and mathematical calculations were based, had been approved by a renowned expert in the field of population genetics. Barnes also objected to testimony regarding the procedures used during the comparison of the specimens recovered from Meinhardt's autopsy and a known blood sample taken from him. (R. 551.) Both objections were overruled without explanation.
We also note that the appellate courts of this state have not had the opportunity to address the method of testing used in Barnes's case, the polymerase chain reaction or "PCR" test. All opinions by this Court and by the Alabama Supreme Court to date have involved cases using the restriction fragment length polymorphism or "RFLP" test. According to report issued by the National Research Council, DNA Technology in Forensic Science
(National Academy Press, 1992), the PCR test was developed subsequent to the RFLP test and, at the time the report was published, was not used as extensively as RFLP testing. This court is aware, however, that other states have approved the use of the PCR test in criminal proceedings since 1992.
On retrial, we would direct the trial court to follow the tests and procedures established in Ex parte Perry,586 So.2d 242 (Ala. 1991), and in § 36-18-30, Ala. Code 1975. When the admissibility of DNA evidence is challenged:
 "the trial court should conduct a hearing outside the presence of the jury to address the considerations and apply the tests contained [in Perry]. That hearing can be conducted either as a preliminary hearing or when the court chooses, but it should be held outside the presence of the jury, because the admissibility of the evidence is what is challenged."
Perry, 586 So.2d at 255.
For the above-stated reasons, the judgment of the trial court is due to be, and it is hereby reversed, and the cause remanded for proceedings consistent with this opinion.
REVERSED AND REMANDED.
All the Judges concur.*
[1] Because certain issues in the sentencing phase of the trial relating to Cimprich's murder, from which Barnes also appeals a sentence of death, are dependant upon the outcome of the appeal in this case, we are releasing both opinions on the same day.See [Ms. CR-95-1321, Sept. 5, 1997] ___ So.2d ___ (Ala.Cr.App. 1997).
[2] We take judicial notice that Dr. Leroy Riddick has personally testified in many cases that have been before this Court on appeal. E.g., Ivery v. State, 686 So.2d 495 (Ala.Cr.App. 1996);Hutcherson v. State, 677 So.2d 1174 (Ala.Cr.App. 1994); Jonesv. State, 591 So.2d 569 (Ala.Cr.App. 1991).
* BROWN and BASCHAB, JJ., were not members of this court when the oral argument was held. They have listened to tapes of that argument. *Page 1030