[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 225 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 226 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 227 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 228 
On April 6, 2001, Michael Ray Baird was convicted of intentional murder, a violation of § 13A-6-2(a)(1), Ala. Code 1975, and felony-murder, a violation of § 13A-6-2(a)(3), Ala. Code 1975.[1]
The trial court sentenced him, as an habitual offender, to two terms of life in prison without the possibility of parole; the sentences were to run consecutively. See § 13A-5-9(c)(4), Ala. Code 1975. Baird filed a motion for a new trial, which the trial court denied following a hearing. This appeal followed.
The evidence at trial revealed the following. Baird is married to Ricky Lamastus's sister, Linda. The bodies of Ricky and Joyce Lamastus were discovered in their residence on Sunday, October 4, 1998, by a friend of Joyce Lamastus.[2] Ricky Lamastus had been shot twice, once in the head and once in the neck. Joyce Lamastus was shot four times, once in the chest that penetrated the heart and left lung and three times in the back of the neck around the base of the skull. All of the gunshots were from close range.
Mitch Rector, a forensic scientist with the Department of Forensic Sciences, testified that the six spent shell casings recovered from the gun in Baird's vehicle had been fired from the pistol that had been recovered from Baird's car. Rector testified that the bullets recovered from the crime scene or from the victims' bodies contained similarities to bullets that were test-fired from the gun recovered from Baird's vehicle. Rector testified that the gun could not be excluded from consideration as the gun that fired the bullets recovered from the Lamastuses' residence or from the bodies, but that the bullets were too badly damaged to state with absolute certainty that they had, in fact, been fired from that gun.
Ricky and Joyce Lamastus had filed charges against Baird stemming from a prior incident. One witness testified that Joyce Lamastus stated to her during a telephone conversation on October 1, 1998, that Baird had come to their house and waved a gun around.[3] Then, on October 2, 1998, the Lamastuses filed a complaint against Baird, alleging that he had threatened in a telephone conversation to kill them. Another witness testified that on October 2, 1998, Baird had stated to her that he was going to kill Ricky and Joyce Lamastus if they did not leave him and his wife alone.
Baird was arrested for driving under the influence of alcohol on Friday, October 2, *Page 229 
1998, at approximately 6:50 p.m. The arresting officer found a .38 caliber handgun in Baird's car. The deputy discovered that the pistol had six empty cartridges in the cylinder, which the deputy emptied from the gun. The deputy also noticed prescription bottles with Joyce Lamastus's name on them in the car. Shannon Kiley, Baird's stepdaughter, took Baird's car home. She discovered Joyce Lamastus's purse, prescription bottles, an ATM card, a debit card, Blockbuster video rental card, and other personal items belonging to Joyce Lamastus. Baird's wife subsequently turned the items over to the police.
Two witnesses testified as to their observations of Baird while he was in jail after he was arrested for driving under the influence. One witness testified that he saw Baird take a shower with his clothes on and saw him flush his socks down the toilet. This witness testified that Baird told him that he had killed somebody and that he had to get rid of the evidence. Another witness testified that he saw Baird cut his shoes into pieces and discard them in a trash can. Ricky and Joyce Lamastus's bodies were found in their residence at approximately 10:30 on the morning of Sunday, October 4, 1998.[4] Baird, in a statement recorded by audio-and video-recording devices, confessed to committing the murders.[5]
Baird asserts 11 issues on appeal, and we address each in turn.
 I.
First, Baird argues that the trial court erroneously denied his motion to suppress the evidence seized from his vehicle. Specifically, Baird argues that the trial court should have held that the gun and the prescription bottles were inadmissible because, according to Baird, they were seized during an unconstitutional warrantless search of his car. At trial, Baird argued that the State had not shown "a prerequisite" for the search. (R. 258.) The trial court conducted a hearing on Baird's motion to suppress. At the hearing, Baird argued that the items should have been suppressed because the police did not obtain a warrant and the search was not an inventory search. We disagree.
"In reviewing a trial judge's decision on a motion to suppress where the evidence is not in dispute, we apply a de novo standard of review.See State v. Hill, 690 So.2d 1201 (Ala. 1996); Barnes v. State,704 So.2d 487 (Ala.Cr.App. 1997)." Tuohy v. State, 776 So.2d 896, 898
(Ala.Crim.App. 1999); State v. Otwell, 733 So.2d 950, 952 (Ala.Crim.App. 1999).
In State v. Otwell, supra, this Court stated:
 "`"This court has long held that warrantless searches are per se unreasonable, unless they fall within one of the recognized exceptions to the warrant requirement. See, e.g., Chevere v. State, 607 So.2d 361, 368 (Ala.Cr.App. 1992). These exceptions are: (1) plain view; (2) consent; (3) incident to a lawful arrest; (4) hot pursuit or emergency; (5) probable cause coupled with exigent circumstances; (6) stop and frisk situations; and (7) inventory searches. Ex parte Hilley, 484 So.2d 485, 488 (Ala. 1985); Chevere, supra, 607 So.2d at 368.'" *Page 230 
 "State v. Mitchell, 722 So.2d 814 [,820] (Ala.Cr.App. 1998), quoting Rokitski v. State, 715 So.2d 859 [,861] (Ala.Cr.App. 1997)."
733 So.2d at 952.
"`When officers lawfully arrest an automobile occupant, they may search the passenger compartment of the automobile as a contemporaneous incident of the arrest, and they also may examine the contents of containers found in the automobile.'" State v. Otwell, 733 So.2d at 954, quoting UnitedStates v. Diaz-Lizaraza, 981 F.2d 1216, 1222 (11th Cir. 1993). "This is so even though the appellant was already handcuffed and placed in the police officer's car when the appellant's car was searched." Mason v.State, 768 So.2d 981, 999 (Ala.Crim.App. 1998), aff'd, 768 So.2d 1008
(Ala. 2000), citing Gundrum v. State, 563 So.2d 27 (Ala.Crim.App. 1990).
Because the deputy discovered the gun and prescription bottles during a search that was incident to a lawful arrest, there was no need for a warrant. The search was valid as an exception to the search warrant requirement, and the ruling of the trial judge on Baird's motion to suppress was correct. Because his claim is without merit, Baird is not entitled to any relief.
 II.
Second, Baird argues that the trial court erroneously denied his motion to suppress the audiotaped and videotaped confession he gave police. Specifically, he contends that the confession was not voluntarily given because, he says, he was under the influence of Xanax and because, he says, Deputy James Edwards used prayer and religious counseling to coerce him to confess. We disagree.
Baird filed a pretrial motion to suppress the statement, and the trial court conducted a hearing on the motion. After hearing evidence from Baird and the prosecution and viewing the videotaped statement and listening to the audiotaped version, the trial judge denied Baird's motion to suppress the statement. At trial, Baird preserved this claim for appeal with a timely objection when the prosecution offered and introduced the videotape into evidence.
In Flynn v. State, 745 So.2d 295 (Ala.Crim.App. 1999), this Court stated:
 "`The standard of review when there is conflicting evidence at a hearing on a motion to suppress evidence of a confession is whether the trial court's decision was "manifestly contrary to the great weight of the evidence." Ex parte Matthews, 601 So.2d 52, 54-55
(Ala.), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992). We will not disturb the trial court's decision on the voluntariness of a confession unless it is clearly erroneous. Ex parte Youngblood, 656 So.2d 390, 392 (Ala. 1995).'"
745 So.2d at 305-06, quoting Barnes v. State, 704 So.2d 487, 492
(Ala.Crim.App. 1997).
In Richardson v. State, 819 So.2d 91 (Ala.Crim.App. 2001), this Court stated:
 "`The fundamental requirements for voluntariness of confessions are that the court must conclude, in order to find a defendant's confession voluntary, that he made an independent and informed choice of his own free will, that he possessed the capacity to do so, and that his will was not overborne by pressures and circumstances swirling around him. Jurek v. Estelle, 623 F.2d 929 (5th Cir. 1980) (en banc), cert. denied, 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981); Lewis v. State[, 535 So.2d 228
(Ala.Crim.App. 1988)]. The test is whether, considering the totality of the circumstances, law enforcement officials have *Page 231 
overborne the will of the accused. Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961). The factual inquiry centers on the conduct of the law enforcement officials in creating pressure and the suspect's capacity to resist that pressure. Mincey v. Arizona, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); Martin v. Wainwright, 770 F.2d 918 (11th Cir. 1985); Jurek v. Estelle. The defendant's personal characteristics as well as his prior experience with the criminal justice system are factors to be considered in determining his susceptibility to police pressures. Fikes v. Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246
(1957); Stein v. New York, 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953); Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948); Martin v. Wainwright.
 "`The question of whether a confession was voluntary is initially to be determined by the trial court. Ex parte Singleton, 465 So.2d 443 (Ala. 1985). Thereafter, the voluntariness as affecting the credibility and weight to be given any statement that an accused has made is a determination for the jury. Id. The finding of the trial court will not be disturbed on appeal unless it appears to be contrary to the great weight of the evidence or is manifestly wrong. Lewis v. State; Magwood v. State[, 494 So.2d 124
(Ala.Crim.App. 1985), aff'd, 494 So.2d 154 (Ala. 1986), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986)]; Marschke v. State, 450 So.2d 177
(Ala.Cr.App. 1984). Even where there is credible testimony to the contrary, if the evidence is fairly capable of supporting the inference that the rules of freedom and voluntariness were observed, the ruling of the trial judge need only be supported by substantial evidence and not to a moral certainty. Chambers v. State, 455 So.2d 1008 (Ala.Cr.App. 1984). The trial court need only be convinced from a preponderance of the evidence to find a confession to have been voluntarily made. Ex parte McCary, 528 So.2d 1133 (Ala. 1988); Ex parte Singleton; Lewis v. State.'
 "Jackson v. State, 562 So.2d 1373, 1380-81 (Ala.Crim.App. 1990)."
819 So.2d at 101.
The trial court held a suppression hearing to determine the admissibility of the taped confession. The evidence at the suppression hearing revealed the following: Detective Phillip Magina, a Fultondale police officer, and Byron Pigg, Chief of Police in Fultondale, interviewed Baird at the Chilton County jail at 12:18 a.m. on October 5, 1998. Detective Magina read Baird his Miranda warnings, and Baird indicated that he understood his rights. After 5-10 minutes of preliminary or general conversation, Detective Magina told Baird that he wanted to talk about the murders of Ricky and Joyce Lamastus, and Baird terminated the interview. Detective Magina told Baird that he thought Baird was lying about not being involved in the murders. As Baird left the room, Detective Magina said "something to the effect [that he] would see [Baird] burn in the electric chair." (R. 350.)
James Edwards, an investigator with the Chilton County Sheriff's Department, testified that he met with Baird a few times over a three-day period. Edwards read Baird his Miranda warnings, and Baird signed the waiver-of-rights form and indicated that he understood his rights. *Page 232 
Edwards testified that he noticed that Baird appeared stressed, so he told Baird:
 "`Now, if there is somebody you need to talk to, you know, I am here, and I can talk to you about it.' I am also a religious person, and I told him that, you know, he could always talk to God and Jesus and ask them to help him out of any situations he might be in."
(R. 365.) Edwards testified that he prayed with Baird and that Baird indicated that he wanted to discuss something.
 "[Edwards]: He said there was a situation that had occurred days prior to this. He wouldn't get into any specifics about it. He had indicated that he wasn't ready, at that time, to reveal everything that happened up there, but it was a very bad situation."
 "[Prosecutor]: Okay. Did you say anything else to him about that?
 "[Edwards]: Yes, I told him that, you know, `You need to pray on it,' and try and work things out between him and God. That, you know, this was something that he had to bear, you know. He couldn't just hold it inside. It's something that had to come out. And he agreed that it eventually would have to come out and he would tell. Later in the conversation he did say that he would like to tell me what it is, but he wanted to do it in front of his wife."
(R. 366-67.) Edwards spoke to the Fultondale Police. He again gave Baird his Miranda rights. Baird wrote and signed the following statement that was faxed to the Fultondale Police Department: "`I am willing to tell my side of the story about the circumstances behind the situation at 100 Oak Trailer Park, when my wife, Linda Baird, and investigator [James] Edwards are present. But only these two may be present.'" (R. 369.) The interview took place and was recorded by audio-and video-recording devices. Baird confessed to the murders.
Chief Pigg testified that he had no knowledge of any religious conversations between Baird and Edwards. Chief Pigg did remember that, after the interview was concluded, Baird said something about being tricked, but that he did not explain what he meant when he was asked about that statement. Chief Pigg testified that Baird did not ask to turn the recording devices back on after conclusion of the interview.
Baird's testimony at the suppression hearing revealed the following. When Baird tried to end the initial interview with Chief Pigg and Detective Magina, Detective Magina followed him down the hallway shouting, "`I got you by your nuts,' and `You ain't got to worry about hepatitis C killing you, because I am going to fry you up like a hamburger.'" (R. 414.) After meeting with Edwards three to four times, Baird consented to the statement's being recorded by video and audio devices and he also consented to having Chief Pigg present, so long as Detective Magina was not present. Baird testified that he requested his wife be present before he would give a statement. Baird stated that he was under the influence of Xanax while in jail, and that, as the videotaped statement was given late in the evening he "had probably taken at least eight [Xanax tablets on the day that he gave the statement]." (R. 413.) Baird testified that nobody asked him about the Xanax, but that one of the other inmates told a guard that Baird had some drugs.[6]
Baird claimed to *Page 233 
have requested that the recording devices be turned back on because he felt that he had been tricked. He had several prior offenses and had been interviewed before and had invoked his right to remain silent and his right to an attorney on previous occasions. He understood his rights when they were read to him in jail on this occasion as well. Edwards gave him coffee and cigarettes, but he did not think that Edwards tried to pass himself off as a counselor. Baird testified that he would not have given the statement if Edwards had not met with him and prayed with him. Baird stated: "I was pretty messed up. I was high, been running on a binge for probably three weeks. You know, like, I don't remember half of what I did." (R. 436.) The trial judge viewed the videotaped confession and listened to the audiotaped version. The trial judge stated that she "didn't hear anything on there about anybody being coerced or tricked." (R. 442.)
Baird's trial attorneys argued that Edwards had used religion to coerce Baird into confessing, and then attempted to call Linda Baird to testify. The prosecutor objected to Linda Baird's being called to testify as a witness in this matter and then being allowed to assert spousal privileges at trial. The defense proffered for the record that Linda Baird would testify that Edwards had instructed her to tell Baird that it would be easier on the family if he confessed and that God was the reason that she had come to hear him confess. The trial judge stated that what occurred at the end of the tape, where Baird allegedly said that he had been tricked, had nothing to do with his giving his statement. The trial judge noted that Baird did not speak to his wife before he gave the statement. The trial judge further stated: "What I recall is, the fax was sent, and he said that he would give a statement if his wife and that particular police officer were there. There was no comment about [religion] that I can recall, unless there is something that I haven't seen." (R. 446.) The trial judge sustained the objection and did not allow Linda Baird to testify at the suppression hearing. The trial judge then denied Baird's motion to suppress the videotaped confession.
The trial court's finding on a motion to suppress a confession is given great deference, and will not be overturned on appeal unless that finding is palpably contrary to the weight of the evidence. See, e.g., Taylor v.State, 808 So.2d 1148 (Ala.Crim.App.), aff'd, 808 So.2d 1215 (Ala. 2001); Williams v. State, 795 So.2d 753 (Ala.Crim.App.), aff'd,795 So.2d 785 (Ala. 2001); D.M.M. v. State, 647 So.2d 57 (Ala.Crim.App. 1994). The mere fact that Edwards prayed with Baird, without more, did not amount to coercion. See, Bradley v. State, 577 So.2d 541, 551
(Ala.Crim.App. 1990) (prayer between defendant and sheriff's department sergeant, who was a Pentecostal lay minister, and sergeant's encouragement to "get in touch" with purported "visions" from God about killer and the murder did not amount to psychological pressure, coercion, or improper influence to disclose content of "visions"). Although Baird testified that he had taken Xanax prior to giving the statement, he also testified that he understood his rights when they were read to him by the police, that he was not intoxicated at the time, and that he was able to function while he was in jail prior to giving the statement.
The trial court had before it evidence indicating the following. Baird met with and prayed with Edwards and indicated to Edwards that something was *Page 234 
bothering him. Baird told Edwards that he wanted to make a statement under certain conditions. At Baird's request, Edwards arranged for Baird's wife to be present, and Baird confessed to committing the murders. The trial court was in the best position to observe the witnesses at the suppression hearing and to weigh their testimony. Based on the totality of the circumstances, we cannot say that the trial court's denial of the motion to suppress was "`manifestly contrary to the great weight of the evidence.'" See Richardson v. State, 819 So.2d at 97, quoting Barnes v. State, 704 So.2d 487, 492 (Ala.Crim.App. 1997). The trial judge did not err in denying Baird's motion to suppress.
 III.
Third, Baird argues that the trial court erred in its ruling on spousal privilege. Specifically, he contends that the trial court should have allowed his wife to testify at the suppression hearing regarding the events surrounding the taped confession but also have allowed her to assert her spousal privilege at trial if questioned by the State regarding statements or events adverse to Baird's position.
In Stevenson v. State, 794 So.2d 453 (Ala.Crim.App. 2001), this Court stated:
 "It is well settled that "`a determination of admissibility of evidence rests within the sound discretion of the trial court and will not be disturbed on appeal absent a clear showing of an abuse of discretion.'" State v. Mason, 675 So.2d 1, 3
(Ala.Crim.App. 1993) (quoting Jennings v. State, 513 So.2d 91, 95 (Ala.Crim.App. 1987)). Charles W. Gamble, McElroy's Alabama Evidence § 21.01(6) (5th ed. 1996) provides:
 "`Whether evidence is to be excluded . . . lies within the sound discretion of the trial judge. . . . This is where such power should lie because, unless some discretion is vested in the trial judge, every ruling upon the admissibility of a particular fact, of a kind above-mentioned, becomes a law unto itself. If any particular rule of evidence runs into numerous borderline cases, we must either give the trial court some discretion in applying it or admit that the rule is not workable at all.'"
794 So.2d at 456.
During the suppression hearing, the defense attempted to call Linda Baird to testify for the limited purpose of testifying as to her discussions with Edwards and the effect of those discussions on the voluntariness of Baird's confession. The prosecutor objected, stating:
 "If she's going to get up and testify for the purpose of this hearing to suppress, then I want to be able to call her as a witness to testify about those facts. If she intends to invoke the marital privilege at that time, with the intent that she not have to testify against her husband, I don't think that she should be allowed, at this time, to testify in his favor. . . . I know of no case that says a spouse can come in and testify in a suppression hearing, testify on only good things for her spouse, and then when she's asked to testify about the bad things that she knows, say `Hey, I have a right not to testify against my spouse.'"
(R. 405-06.) The prosecutor further stated:
 "If I may, Your Honor, there are two aspects to the marital privilege: the marital privilege with regard to communication between the husband and wife, and there is also a marital privilege with regard to even taking the stand against her husband; the statute that says a spouse may not be compelled to testify against her husband, she can't say *Page 235 
anything, if that's what she wants. If she does decide to testify, the spouse would then have the right to say, `You can testify, but you can't say anything that you and I talked about.' Now, what she wants to do in this case is get up here, waive her spousal immunity, and testify in favor of her husband. But then when I have facts and circumstances that I want to elicit from her as to receiving money from the $700 from the defendant, and facts such as those, bagging up the evidence and turning it over to Fultondale, she then wants to say, `Hey, you can't call me as a witness. I am a spouse.' I don't think that she should be allowed to testify, to pick and choose which testimony she wants to give. Either she's a witness or not."
(R. 407-08.) The trial judge agreed with the prosecutor, and initially ruled that defense counsel could not proffer for the record what Linda Baird's testimony was expected to show.
The following morning, the trial judge allowed Baird's trial counsel to make a proffer for the record of what he expected Linda Baird's testimony to show, and the following exchange occurred:
 "[Defense counsel]: Ms. Baird was prepared to testify that Detective Magina was the one that contacted her about coming down to Chilton County, in order to assist in getting Mr. Baird to confess. Detective Magina actually drove Ms. Baird down to Chilton County. Ms. Baird was told to respond to two questions, if asked, from Mr. Baird. She was told to respond to the question from Mr. Baird, `Why did you come down?' with the statement, quote, `Because God told me to.' The second question that Ms. Baird was told to be prepared to respond to was, `Why did you want Michael Baird — why do you want Michael to confess?' `Because God said to make it easier — it would make it easier.' — I am sorry. `Because God said that a confession would make it easier on the family.' There was a third question that she —
 "The Court: Now, wait a minute. I don't understand that. If the defendant asked her that?
 "[Defense counsel]: If the defendant — if the defendant were to ask his wife, either before, during, or after the confession, `Why do you want me to confess? Why do you, Linda Baird, want me, Michael Baird, to confess to this crime —
"The Court: Right.
 "[Defense counsel]: — Mrs. Baird was to respond to Michael, `Because God says that if you confess, it will make it easier on the family.' There was a third question that she was asked, that she cannot recall what that — what she was — what the third question was that she was to respond to. We were going to have her testify as to what Detective Edwards said to her. And that's essentially what I just related. We were going to ask her to testify to how many times she had an opportunity to meet with Michael privately, both before the confession and afterwards, and also whether or not she was allowed to speak to Michael on the phone while he was at the Chilton County jail. Her testimony was going to be that initially, the first day, she was allowed to get phone calls, or she got phone calls from Michael, but then had no more communications from him until she saw him at the confession. And then she was also going to testify about the comments that Mr. Baird says were made at the time of the confession, that he was tricked, and just the overall tone and tenor of how the confession came about. *Page 236 
 "The Court: All right, so she was going to testify that he made the comment that he was tricked after he had already given the confession, and after he had already asked to be placed in protective custody, once transferred to the Jefferson County Jail. Is that right?
"[Defense counsel]: Yes, ma'am.
"The Court: Okay.
 "[Defense counsel]: That he was going — that she was going to testify as to what occurred at the end of the tape, which is apparently not on the tape.
 "The Court: All right. That has nothing to do with him giving his statement, though.
 "[Defense counsel]: The initial — as to him giving it beforehand, no. It only goes to what his belief was, after the statement was given, based on all the circumstances; that he was tricked, coerced, and did not give a voluntary statement.
 "The Court: Okay. Now, did he speak with her before he gave the confession?
"The Defendant: No.
"[Defense counsel]: No, ma'am.
"The Court: He didn't speak with her.
"[Defense counsel]: No, ma'am.
 "The Court: So he didn't ask her these questions, and nobody asked her these questions before his statement was given. Is that right?
 "[Defense counsel]: That's correct. But the context, the entire environment was set up by the police, so that Mr. Baird believed that Linda was there by an act of God. Because that's what [James] Edwards had led Mr. Baird to believe, and Mr. Baird had said that `If God wants me to confess, my wife will be here.' Well, his wife was there.
 "[Prosecutor]: That's — That's a mischaracterization of the testimony.
 "The Court: I have not — I don't recall that. What I recall is, the fax was sent, and he said that he would give a statement if his wife and that particular police officer were there. There was no comment about `God this' and `God that,' that I can recall, unless there is something that I haven't seen."
(R. 442-46.)
Baird, on appeal, argues that the trial judge erred in her ruling on spousal privilege. However, it appears from the record that, ultimately, after defense counsel had proffered for the record what Linda Baird's testimony was expected to show, the trial judge deemed Linda Baird's testimony irrelevant to show that Baird's statement was not voluntarily given. The trial judge specifically stated: "That has nothing to do with him giving his statement, though." (R. 445.) The trial judge noted that Linda Baird was present at Baird's request and that Baird did not speak to her before he gave his statement. The trial judge apparently determined that Linda Baird's testimony was not relevant to the court's determination whether to grant or deny Baird's motion to suppress the statement.
Based on the above-quoted portion of the record, it appears that the proffered testimony was irrelevant as to whether Baird's confession was voluntary. We see nothing in the proffered testimony that would have made the statement involuntary. Even if Linda Baird had been allowed to testify, the outcome of the hearing on the motion to suppress the statements would have been the same. Error, if any, in the trial judge's ruling was harmless at most. Baird is not entitled to any relief on this claim.
 IV.
Fourth, Baird argues that the trial court erroneously allowed hearsay testimony. *Page 237 
Specifically, he contends that the trial court should not have allowed Debbie Harper to testify as to what Joyce Lamastus told her Baird had stated in a telephone conversation. Baird also contends that Harper should not have been allowed to testify about Joyce Lamastus's state of mind. Additionally, Baird contends that the trial court should not have allowed Joy Morman to testify as to information given in a complaint by Ricky Lamastus.
Harper testified that she spoke to Joyce Lamastus on Thursday, October 1, 1998, the day before the Lamastuses were last seen alive. When the prosecutor first attempted to elicit this testimony, Baird's trial counsel objected, and the trial court excused the jury. The prosecutor, by questioning Harper, explained what he expected the evidence to show and argued that the testimony was admissible under the excited-utterance exception to the hearsay rule. The trial judge overruled Baird's objection and brought the jury back to the jury box. Harper testified that Joyce had told her that Baird "had come to the [Lamastuses'] house, waving a gun." (R. 233.)
Morman testified that she was the court clerk for the City of Fultondale in October 1998. Outside of the presence of the jury, the prosecutor proffered what he intended to question Morman about, and Baird's trial counsel objected on hearsay grounds. The prosecutor argued that the evidence was admissible as res gestae, i.e., part of a continuous act or occurrence with the murders. The trial judge overruled Baird's objection and brought the jury back to the jury box. Morman identified State's exhibit 87 as a complaint filed by Ricky Lamastus on October 2, 1998, "stating that Mr. Baird had communicated with him by phone that he was going — going to kill he and his wife, and he wanted to try to take measures for that not to happen; that somebody be notified of it." (R. 476.) She identified State's Exhibit 88 as, "The deposition that Mr. Lamastus completed that accompanies the complaint. This is something that the complainant fills out in his own handwriting, telling the magistrate what happened." (R. 476.) Ricky Lamastus was under oath when he gave the "deposition." Morman testified that: "Mr. Lamastus wrote on the deposition, speaking of Mr. Baird, `He called several times, threatening my life, as well as my wife's, if we didn't drop charges. He pulled a .357 magnum and said he would kill me. He admitted stealing the $4000 and property.'" (R. 477.)
 "It is well settled that "`a determination of admissibility of evidence rests within the sound discretion of the trial court and will not be disturbed on appeal absent a clear showing of an abuse of discretion.'" State v. Mason, 675 So.2d 1, 3
(Ala.Crim.App. 1993) (quoting Jennings v. State, 513 So.2d 91, 95 (Ala.Crim.App. 1987)). Charles W. Gamble, McElroy's Alabama Evidence § 21.01(6) (5th ed. 1996) provides:
 "`Whether evidence is to be excluded . . . lies within the sound discretion of the trial judge . . . This is where such power should lie because, unless some discretion is vested in the trial judge, every ruling upon the admissibility of a particular fact, of a kind above-mentioned, becomes a law unto itself. If any particular rule of evidence runs into numerous borderline cases, we must either give the trial court some discretion in applying it or admit that the rule is not workable at all.'"
Stevenson v. State, 794 So.2d 453, 456 (Ala.Crim.App. 2001).
Rule 801(c), Ala. R. Evid., defines hearsay as, "a statement, other than one made by the declarant while testifying at *Page 238 
the trial or hearing, offered in evidence to prove the truth of the matter asserted." Hearsay is not admissible unless it falls under an exception to the hearsay rule.
Rule 803, Ala. R. Evid., provides, in relevant part:
 "The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
 "(1) Present Sense Impression. A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter.
 "(2) Excited Utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."
In Whitehead v. State, 777 So.2d 781 (Ala.Crim.App. 1999), aff'd,777 So.2d 854 (Ala. 2000), this Court stated:
 "`"`"Testimony going to show motive, though motive is not an element of the burden of proof resting on the state, is always admissible." . . . Even slight evidence to show motive for doing the act in a criminal case is not to be excluded, but should be left to the consideration of the jury.''" Siler v. State, 705 So.2d 552, 556-57 (Ala.Cr.App. 1997), quoting Giddens v. State, 565 So.2d 1277, 1281
(Ala.Cr.App. 1990)."
777 So.2d 781, 824-25.
An attempt to avoid charges stemming from another incident can certainly be considered motive to commit homicide. See generally,Whitehead, supra.
In Lovett v. State, 491 So.2d 1034 (Ala.Crim.App. 1986), this Court stated:
 "`Facts or declarations to be admissible under the principle of res gestae must be substantially contemporaneous with the main fact under consideration and so closely connected with it as to illustrate its character, Dudley v. State, 185 Ala. 27, 64 So. 309
[(1914)]; Jackson v. State, 177 Ala. 12, 59 So. 171
[(1912)]; Moss v. State, 190 Ala. 14, 67 So. 431
[(1914)]. It is true, however, that where there is an unbroken chain of events beginning with a prior difficulty and leading up to the killing, the chain of events leading up to the killing need not be a part of the res gestae in the sense that these events became a part of the crime itself, but they are admissible since they lead up to and tend to explain the acts, animus or intent of the defendant at the time he committed the killing. Keith v. State, 253 Ala. 670, 46 So.2d 705
[(1950)]; Smith v. State, 253 Ala. 220, 43 So.2d 821
[(1950)]; Collins v. State, 138 Ala. 57, 34 So. 993, 994
[(1903)].' Byrd v. State, 257 Ala. 100, 103, 57 So.2d 388, 390-91 (1952)."
491 So.2d at 1036-37.
Harper's testimony was admissible under the present sense impression exception to the hearsay rule. Additionally, both witnesses' testimony was admissible as evidence of motive. We also note that the testimony of both witnesses tended to show a continuous chain of events that led up to the killing. See e.g., Lovett v. State, supra.
Moreover, even if the trial judge erred in admitting the testimony of the two witnesses, any error would have been harmless. Erroneous admission of hearsay evidence is subject to a harmless-error analysis.See, e.g., Jackson v. State, 791 So.2d 979, 1013-14 (Ala.Crim.App. 2000). Without the testimony of the two witnesses, the State still presented ample evidence from which the jury could have reached the same result.
Mary Pierce testified, without objection, that Baird told her that he was going to kill the Lamastuses "[i]f they didn't leave *Page 239 
him alone." (R. 213.) Ricky Lamastus had been shot twice and Joyce Lamastus had been shot four times. Baird was in possession of a gun with six spent cartridges in it and personal items belonging to Joyce Lamastus, including a prescription that had been filled a few hours earlier. Though the bullets recovered from the Lamastuses' residence and from their bodies were too badly damaged to determine without a doubt that they had been fired from the gun recovered in Baird's vehicle, forensic testimony did establish that the bullets were within the range of bullets for that gun, that they shared similarities with bullets that had been test-fired from that gun, and that they could not be excluded as being fired from that gun. Additionally, Baird confessed to committing the murders. From this testimony and evidence, the jury could have found Baird guilty of the charged crimes. Because his claim is without merit, Baird is not entitled to any relief.
 V.
Fifth, Baird argues that the trial court erroneously allowed evidence without the proper chain of custody being established. Specifically, he claims that the trial court should not have allowed the admission into evidence of the purse, the Blockbuster video rental card, paycheck stubs, and other property belonging to Joyce Lamastus, because, Baird says, those items "allegedly came out of Baird's automobile" and the automobile was not in the custody of the police from the time Baird was arrested. (Baird's brief, p. 35.) We disagree.
In Broadnax v. State, 825 So.2d 134, 171 (Ala.Crim.App. 2000), this Court stated: "`"[c]hain of custody requirements do not apply with the same force to items of evidence which are unique and identifiable in themselves.'" Ex parte Scott, 728 So.2d 172, 182 (Ala. 1998), quotingMagwood v. State, 494 So.2d [124] at 144 [(Ala.Crim.App. 1985)]."
In Burrell v. State, 689 So.2d 992 (Ala.Crim.App. 1996), this Court stated:
 "Proper analysis of a chain of custody question, however, does not begin at the time of the offense; the chain of custody begins when [an] item of evidence is seized by the State. State v. Conrad, 241 Mont. 1, 785 P.2d 185 (1990); 29A Am.Jur.2d, Evidence § 947 (1994 ed.) (`The chain-of-custody rule does not require the prosecution to account for the possession of evidence before it comes into their hands.') Anyone who has handled evidence in the State's possession is a `link' in the chain of custody; once the evidence is in the State's possession, it is the State's duty to account for each link. § 12-21-13, Code of Alabama (1975). See, Ex parte Holton, 590 So.2d 918, 920
(Ala. 1991). The jury must determine the weight to accord the evidence. Kennedy v. State, 690 So.2d 1222
(Ala. 1996)."
689 So.2d at 995-96.
In Burrell, Brown, a witness at the scene and a relative of the victim, removed a gun from the victim's hand, took it from the crime scene and threw the empty shells into a field. Two weeks later Brown gave the gun to another relative of the victim's, who turned the gun over to the police. At trial, Brown testified about his actions with the gun, and this Court held:
 "In this case, Mr. Brown is not a link in the chain for which the State must account. He testified as to his particular actions regarding the gun, and it is the jury's task then to consider how those actions affected the item of evidence in question and how much weight to assign to that item. There is no evidence to contradict the assertion that this gun is [the victim's] gun, which was clearly marked with a serial number and *Page 240 
which was registered to her. (R. 595.) The police ultimately received the gun and handled it as they did the rest of the evidence in this case."
689 So.2d at 996.
Here, Kiley testified that, at Baird's request, she drove to where Baird was being arrested for driving under the influence and took possession of the car. She drove it home and, the following morning, she searched the car. She identified the purse, the Blockbuster video rental card, the debit card, and the ATM card, and six empty shell cartridges as being among the items she found in the vehicle. She testified that she saw her mother, Linda Baird, place those and other items from the car into a garbage bag. Kiley testified that the bag was not brought into the house; she believed Linda Baird placed the bag in her car. Kiley testified that she saw her mother release the bag to the Fultondale Police Department on the night of October 4, 1998. There is no evidence to contradict the assertion that the video rental card, the bank cards, driver's license, temporary driver's license, and pay stubs belonged to Joyce Lamastus, and they were in her name.
Because Kiley is not a link in the chain of custody for which the State must account, the trial judge properly overruled Baird's objections that the State had failed to establish a proper chain of custody. The weight to give Kiley's testimony to the effect that the items were in Baird's car was a question for the jury. See, Burrell, supra; Powell v. State,796 So.2d 404, 420-21 (Ala.Crim.App.), aff'd, 796 So.2d 434 (Ala. 2001). Baird is not entitled to any relief; his claim is without merit.
 VI.
Sixth, Baird argues that the trial court erroneously limited his opportunity to cross-examine four witnesses. Specifically, he contends that the trial court, by sustaining the prosecutor's objections, prevented him from conducting a thorough and sifting cross-examination of Edwards, Debbie Harper, Shannon Kiley, and Deputy Whitney Ray, thus preventing him from impeaching their testimony.
However, we note that because Baird did not raise these grounds before the trial court, he has failed to preserve it for our review. See, e.g.,Fitch v. State, 851 So.2d 103 (Ala. Crim App. 2001); Crenshaw v. State,740 So.2d 478, 480 (Ala.Crim.App. 1998); Clay v. State, 687 So.2d 1245,1250 (Ala.Crim.App. 1996).
Moreover, even if Baird had preserved this issue for our review, he would not have been entitled to any relief because his claims are without merit.
In Reeves v. State, 807 So.2d 18 (Ala.Crim.App. 2000), this Court stated:
 "It is well settled that `[a] party is entitled to a thorough and sifting cross-examination of the witnesses against him,' McMillian v. State, 594 So.2d 1253, 1261 (Ala.Crim.App. 1991), remanded on other grounds, 594 So.2d 1288 (Ala. 1992), opinion after remand, 616 So.2d 933 (Ala.Crim.App. 1993), citing Perry v. Brakefield, 534 So.2d 602 (Ala. 1988), and § 12-21-137, Ala. Code 1975, and that a party should be given `wide latitude on cross-examination to test a witness's partiality, bias, intent, credibility, or prejudice, or to impeach, illustrate, or test the accuracy of the witness's testimony or recollection as well as the extent of his knowledge.' Williams v. State, 710 So.2d 1276, 1327 (Ala.Crim.App. 1996), aff'd, 710 So.2d 1350 (Ala. 1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998). It is equally well established, however, `that the latitude and extent of *Page 241 
cross-examination are matters which of necessity rest largely within the sound discretion of the trial court, and rulings with respect thereto will not be revised on appeal except in extreme cases of abuse.' Long v. State, 621 So.2d 383, 388 (Ala.Crim.App. 1993), cert. denied, 510 U.S. 932, 114 S.Ct. 345, 126 L.Ed.2d 310 (1993), quoting Beavers v. State, 565 So.2d 688, 689 (Ala.Crim.App. 1990). `The trial judge may reasonably limit the range of cross-examination on matters that are repetitious, argumentative, collateral, irrelevant, harassing, annoying, or humiliating.' Newsome v. State, 570 So.2d 703, 714 (Ala.Crim.App. 1989). `On appeal, the party claiming an abuse of such discretion bears the burden of persuasion.' Ross v. State, 555 So.2d 1179, 1180 (Ala.Crim.App. 1989), quoting Hembree v. City of Birmingham, 381 So.2d 664, 666 (Ala.Crim.App. 1980).
 "Rule 616, Ala.R.Evid., provides that `[a] party may attack the credibility of a witness by presenting evidence that the witness has a bias or prejudice for or against a party to the case or that the witness has an interest in the case.' Generally, this rule permits cross-examination, and the introduction of independent evidence, regarding statements, acts, or relationships indicating bias or prejudice, including arrests, indictments, and pending charges that have not resulted in convictions even though such `bad acts' are generally inadmissible under Rules 608 and 609, Ala.R.Evid. See, e.g., C. Gamble, McElroy's Alabama Evidence, § 149.01(8)(a) (5th ed. 1996)."
807 So.2d at 38-39.
 A.
Baird contends that Kiley was biased against him and that he was prevented from establishing that she "was a drug user and that the testimony was tainted by motives other than for the truth of the matter asserted." (Baird's brief, p. 37.) On cross-examination, Kiley admitted that she did not get along with Baird and that four months before the murders, she had gotten into an argument with him on the telephone in which she and Baird cursed at each other. The following exchange occurred:
 "[Baird's counsel]: In fact, your meeting with him first occurred at a half-way house in Five Points West, didn't it?
"[Kiley]: Yes, sir, it did.
 "[Baird's counsel]: And were you going to that half-way house?
 "[Prosecutor]: Judge, I am going to object to the relevance at this time.
 "[Baird's counsel]: Your Honor, I am simply trying to show the bias that this witness has against my client. And I would like to establish the standard as to why this witness's testimony should be viewed by the jury with suspicion.
"The court: Sustained."
(R. 199.) Counsel for both sides approached the bench, and the trial judge then excused the jury. Baird claimed that Kiley thought Baird was "nice" when she met him in 1992, but that the relationship had deteriorated over time to the point of the argument four months before the murders, which, according to Baird, tainted her testimony.
The trial judge allowed Baird to voir dire Kiley. Kiley testified that she was not going through a drug rehabilitation program when she met Baird; that she had only visited there with her mother so she could be introduced to Baird while he was in drug rehabilitation. Kiley admitted that she had smoked marijuana, but testified that she did not use other drugs and that she did not have a drug problem. Baird began questioning Kiley about the Lamastuses and her knowledge of any drug activity at the Lamastuses' residence. *Page 242 
The trial judge stated that Baird was not allowed to use this voir dire to go into discovery. The following exchange occurred:
 "[Prosecutor]: Based upon the other questioning, I would ask that he not be allowed to ask this witness about whether or not the victims in this case sold drugs. She had indicated that she had never seen it. At most, she had heard it, which would be hearsay and inadmissible. And I think [defense counsel] is just using this as a fishing expedition, and I don't want to see that happening in front of the jury.
 "[Baird's counsel]: Your Honor, I would like to be able to ask if she had been at the trailer where the Lamastuses were, if she had seen a lot of people hanging around the trailer, if she had actually witnessed any drug transactions at the trailer.
 "[Prosecutor]: That would be irrelevant. We don't have a time period or anything like that. How that, in any way, is relevant to whether or not this defendant killed them — "
(R. 204.) The trial judge sustained the prosecutor's objection. The jury was brought back in and Baird completed his questioning without objection.
Thus, Baird elicited testimony, in the presence of the jury, from Kiley that she and Baird did not get along with each other and that they had cursed at each other during an argument four months prior to trial. Nothing in the record indicates that the trial judge limited Baird's cross-examination to exclude relevant testimony about Kiley's relationship with Baird or any alleged biases she might have had against Baird that might have affected her testimony. To the contrary, the trial judge merely prevented Baird's trial counsel from questioning Kiley about hearsay evidence dealing with the alleged sale of drugs by the Lamastuses at their residence over an unknown time period, and whether that might have been a factor in their deaths. We find no abuse of discretion, and Baird has shown none. Baird has failed to meet his burden of persuasion as discussed in Reeves v. State, supra. Even if this issue had been preserved, Baird would not have been entitled to any relief.
 B.
Baird contends that he was prevented from establishing that Harper's testimony was based on hearsay and that the statements were not credible. The prosecutor began to question Harper about a telephone conversation she had with Joyce Lamastus on Thursday, October 1, 1998. Baird's counsel objected and the jury was excused. The prosecutor argued that her testimony was admissible under the present-sense-impression exception to the hearsay rule. Baird's counsel was allowed to voir dire Harper. The trial judge overruled Baird's hearsay objection, and the jury was brought back into the courtroom. The prosecutor finished his examination, and Baird conducted a full and thorough cross-examination of Harper without objection. (R. 238-43.)
Baird was allowed to voir dire Harper out of the hearing of the jury. The trial judge still ruled that the testimony was admissible. Nothing in the record indicated that Baird was prevented from conducting a full and thorough cross-examination of Harper. We find no abuse of discretion, and Baird has shown none. Baird has failed to meet his burden of persuasion as discussed in Reeves v. State, supra. Even if this issue had been preserved, Baird would not have been entitled to any relief.
 C.
Baird contends that the trial court prevented him from engaging in a *Page 243 
thorough cross-examination of Deputy Ray. However, Baird has failed to state exactly how the trial court prevented him from conducting the examination, what the trial court should have done differently, or how this alleged error affected his trial. Again, as with Harper, Baird was allowed a full and thorough cross-examination of Ray. The prosecutor did not object during cross-examination or during re-cross-examination. (R. 260-67; 274-75.)
We find no abuse of discretion, and Baird has shown none. Baird has failed to meet his burden of persuasion as discussed in Reeves v. State,supra. Even if this issue had been preserved, Baird would not have been entitled to any relief.
 D.
Finally, Baird argues that the trial court erroneously prevented him from conducting a thorough cross-examination of Edwards during the State's case-in-chief as well as the hearing on Baird's motion to suppress his statement. Specifically, Baird contends:
 "Particularly detrimental to the defense of Baird was the failure of James Edwards to deny statements made to Baird and to Linda Baird regarding God, religion and specific questions and responses to be made. Edwards stated he did not recall making such statements; however, Edwards never denied nor admitted making those statements. The defense was prevented from exploring the memory of Edwards as to whether those statements were made or not. Furthermore, the defense was prevented from exploring the elements of coercion and inducement resulting in Baird's perception of leniency. Edwards testified he discussed God, religion and prayer with Baird and that he was there if Baird needed to talk with someone."
(Baird's brief, p. 37-38.)
At the hearing on the motion to suppress Baird's confession, Edwards testified that he had met with Baird on several occasions. Baird told Edwards that he would give a statement in the presence of Edwards and Linda Baird. Edwards testified that he believed he had a conversation with Linda Baird before Baird gave his statement, but that he could not remember whether it was on the telephone or in person. Edwards testified that he did not recall telling Linda Baird to answer questions in any certain way, but that he did not tell her to say she was there because God told her to be there. (R. 380.) Edwards testified that he did not recall telling Linda Baird to "follow this up with the idea that God sent her down there to hear from him." (R. 388.) At one point in the suppression hearing, Baird's counsel asked Edwards a series of questions about using religion in his interviewing methods, and the following exchange occurred:
 "[Baird's counsel]: You conned this man into talking to you, didn't you?
"[Edwards]: No, sir.
 "[Baird's counsel]: As a matter of fact, you told that wife to follow this up with the idea that God sent her down there to hear from him, didn't you?
"[Edwards]: Again, I don't recall that.
"[Baird's counsel]: Does that mean it didn't happen?
"[Edwards]: I am saying I don't recall that.
"[Baird's counsel]: You told her that, didn't you?
"[Edwards]: I don't recall that.
 "[Baird's counsel]: You don't want to recall that, do you? *Page 244 
 "[Prosecutor]: Judge, I am going to object. The question has been asked and answered.
"[Baird's counsel]: He just said he didn't recall it.
"The Court: Don't badger the witness, [Baird's counsel].
 "[Baird's counsel]: Are you saying, under oath, that you didn't tell that wife that?
 "[Edwards]: I am saying I don't recall that; me telling her to say God sent her. I do not recall that, or recall telling her to say that, no, sir."
(R. 388-89.) At the conclusion of the hearing, the trial judge allowed Edwards's testimony and the videotape into evidence.
At trial, Edwards testified that he prayed with Baird but that he did not recall telling Baird that he would help him get closer to God. He also did not recall telling Linda Baird to answer questions from Baird in any certain way, only that she could not ask any questions during the interview.
Nothing in the record indicated that Baird was prevented from conducting a full and thorough cross-examination of Edwards or of ascertaining what statements Edwards acknowledged, denied, or could not recall having made. The jury heard his answers to those questions, and weighed his testimony accordingly. Both Baird and the prosecutor objected numerous times while Edwards was on the witness stand. Some objections were sustained, and others were denied. We find no abuse of discretion by the trial judge, and Baird has shown none. Baird has failed to meet his burden of persuasion as discussed in Reeves v. State, supra. Even if this issue had been preserved, Baird would not have been entitled to any relief.
 VII.
Next, Baird argues that the trial court erroneously allowed Edwards's testimony regarding Baird's statement. Specifically, he contends that Edwards assumed the role of a counselor or priest and that, therefore, Baird's conversations with Edwards were privileged. At trial, Baird moved to suppress Edwards's testimony regarding Baird's statement on the specific grounds that the testimony was not "relevant or proper." (R. 393.) The trial judge stated that she was going to deny Baird's motion to suppress Edwards's testimony.
"`The statement of specific grounds of objection waives all grounds not specified, and the trial court will not be put in error on grounds not assigned at trial.'" Rogers v. State, 819 So.2d 643, 656 (Ala.Crim.App. 2001) (quoting Ex parte Frith, 526 So.2d 880, 882 (Ala. 1987)). Because Baird objected on the specific grounds that the testimony was not relevant or proper, he may not expand those grounds on appeal to include an allegation that Edwards's actions rose to the level of a counselor or priest and that the communications were privileged, but rather, is limited to those specific grounds raised at trial. See Ponder v. State,688 So.2d 280, 286 (Ala.Crim.App. 1996); Harris v. State, 539 So.2d 1117,1122 (Ala.Crim.App. 1988). Therefore, he has failed to preserve this issue for our review.
Moreover, even if this issue had been preserved, Baird has cited no legal grounds to support his claim that any communication between Baird and Edwards amounted to the type of protected communications to clergymen described in Rule 505, Ala. R. Evid. The fact remains that the dialogue occurred during an active and ongoing investigation. Edwards read Baird his Miranda warnings on three occasions and Baird was again Mirandized before writing the letter stating that he *Page 245 
would voluntarily give a statement in the presence of his wife and Edwards, and again before the taped confession.
Additionally, nothing in the record identifies Edwards as a clergyman as defined in Rule 504(a)(1), Ala. R. Evid. Nor does the record reflect that he is a counselor as defined in Rule 503A, Ala. R. Evid. To the contrary, Edwards stated, "I am an investigator. I am not a chaplain or ordained minister." (R. 385.) Therefore, even if this claim had been preserved, Baird would not have been entitled to any relief because his claim is without merit. See, Bradley v. State, 577 So.2d 541, 551
(Ala.Crim.App. 1990) (prayer between defendant and sheriff's sergeant, Pentecostal lay minister, and sergeant's encouragement to "get in touch" with purported "visions" from God about killer and the murder did not amount to psychological pressure, coercion, or improper influence to disclose content of "visions").
 VIII.
Baird argues that the trial court erroneously allowed the videotape and photographs of the crime scene to be displayed in an improper manner before the jury. Specifically, he contends that approximately 44 photographs of the crime scene and the victims were shown to the jury in addition to a video of the crime scene. Baird also contends that the video was projected with a zoom lens in a manner that distorted the crime scene and that the pictures and video were inflammatory and repetitious. We disagree.
At trial, Baird made a motion in limine seeking to prevent the State from showing the crime scene videotape on the grounds that the prejudicial effect outweighed any probative value, that no physical evidence connected Baird to the crime scene, and that showing the videotape "would simply enflame the jury." (R. 162.) The trial judge denied Baird's motion, and the videotape was played for the jury. Detective Chris Perry, the technician who took the video of the crime scene, testified about the video and crime scene. Detective Perry identified several photographs of the crime scene, and those were admitted into evidence over defense objection. After Detective Perry finished testifying, Baird moved for a mistrial on the grounds that the crime scene videotape was inflammatory. Baird argued that there was no reason for a videotape of the crime scene, that the scene could have been preserved more appropriately through the use of photographs. Baird stated that the technician "used his lens to zoom in on certain things." (R. 327.) Baird argued that the video emphasized a picture of Jesus, to which the trial judge noted that "the picture had blood spatters on it." (R. 327.) Baird again argued that "the best way to have shown [the crime scene] to the jury, with the least prejudicial value — effect in this case, would have been with still photographs." (R. 328.) The trial judge noted that, despite Baird's assertions that "the best way to have shown [the crime scene] to the jury . . . would have been with still photographs," Baird had also objected to the introduction of the still photographs of the crime scene. (R. 328.) The trial judge denied Baird's motion for a mistrial. Baird also objected to the introduction of certain photographs of the victims on the grounds that they were repetitious. The trial judge overruled the objection, and the photographs were admitted into evidence.
In Smith v. State [Ms. CR-97-0069, December 22, 2000] ___ So.2d ___, ___ (Ala.Crim.App. 2000), this Court stated:
 "`"Photographs are admissible into evidence within the discretion of the trial judge and will be reviewed on appeal only to determine if there has been an abuse of that discretion. *Page 246 Fletcher v. State, 291 Ala. 67, 277 So.2d 882
(1973).
 "`"Photographs are admissible if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered. Baldwin v. State, 282 Ala. 653, 213 So.2d 819 (1968). The fact that a photograph is gruesome is not grounds to exclude it as long as the photograph sheds light on issues being tried. Magwood v. State, 494 So.2d 124
(Ala.Cr.App. 1985), aff'd, Ex parte Magwood, 494 So.2d 154 (Ala. 1986), cert. denied, Magwood v. Alabama, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599
(1986).
 "`"Some of the photographs in issue here depicted wounds to the back and neck area of the deceased. The State argues that the photographs were credible evidence for the jury to view in order to determine whether a pocketknife or a larger knife that was found at the scene could have inflicted the depicted wounds. Based on the record, we agree.
"`". . . .
 "`". . . [P]hotographs depicting the character and location of wounds on a deceased's body are admissible even though they are cumulative and are based on undisputed matters. Magwood[v. State], 494 So.2d [124] 141 [(Ala.Cr.App. 1985)]. The fact that a photograph is gruesome is not grounds to exclude it as long as the photograph sheds light on issues being tried. Id. Also a photograph may be gruesome and ghastly, but this is not a reason to exclude it as long as the photograph is relevant to the proceedings, even if it tends to inflame the jury. Id."
"`Ex parte Bankhead, 585 So.2d 112 (Ala. 1991).'"
Smith v. State, ___ So.2d at ___, quoting Smith v. State, 588 So.2d 561,579-80 (Ala.Crim.App. 1991), on return to remand, 620 So.2d 727
(Ala.Crim.App.), on return to remand, 620 So.2d 732 (Ala.Crim.App. 1992).
Baird contended that there was no evidence to link him to the crime scene. In his confession, Baird claimed to have shot Joyce Lamastus in self-defense because she was attempting to reach a machete. Baird also claimed that initially, Ricky Lamastus was holding the gun and that he took the gun from Ricky because he did not know whether Ricky was going to shoot him; in essence, Baird was contending that he shot Ricky Lamastus in self-defense as well.
Portions of the videotape and some of the photographs showed Joyce Lamastus's body lying near a machete. The videotape and some of the photographs also showed the victims' wounds and the blood-splatter and bloodstain patterns. Some of the exhibits showed two bullets near one of the victims; those projectiles were identified by expert testimony as consistent with the type of bullet that would be fired from the gun recovered in Baird's car. Some of the exhibits also showed the location of the door of the residence and its proximity to each victim, which the State argued was relevant to refute Baird's claim of self-defense. The State elicited testimony at trial that indicated which wounds likely occurred while each victim was standing up or lying on the ground. The State argued at trial that the exhibits were relevant to link Baird to the crime scene and were relevant to the issue of self-defense. The trial judge noted that evidence of blood spatter was revealed by the use of the zoom lens on the picture of Jesus at the crime scene. The trial judge also noted that the zoom function was used to *Page 247 
focus on a wall, a table, and a lamp. The trial judge determined that the crime scene videotape and photographs were relevant and that the prejudicial nature was outweighed by the probative value. Based on the record, we agree.
We find no abuse of discretion by the trial judge. Because his claim is without merit, Baird is not entitled to any relief.
 IX.
Next, Baird argues that the trial court improperly instructed the jury regarding the second phase of the jury function. Specifically, he contends that the trial judge made an improper remark and then erroneously denied his motion for a mistrial when the trial judge said, "The first time you go back there, after I give you the Court's oral charge, you decide what, if any, charges the defendant is guilty of." (R. 796.) Baird contends that this remark implied that the trial judge "assumed the accused guilty and that the jury was to render a decision accordingly." (Baird's brief, p. 43.) Baird argues that the statement "resulted in Baird failing to have received an impartial trial and violated his right of due process." (Baird's brief, p. 43.) We disagree.
"A mistrial is a drastic remedy that should be used sparingly and only to prevent manifest injustice." Hammonds v. State, 777 So.2d 750, 767
(Ala.Crim.App. 1999), aff'd, 777 So.2d 777 (Ala. 2000) (citing Ex parteThomas, 625 So.2d 1156 (Ala. 1993)). A mistrial is the appropriate remedy when a fundamental error in a trial vitiates its result. Levett v.State, 593 So.2d 130, 135 (Ala.Crim.App. 1991). "`The granting of a mistrial is addressed to the broad discretion of the trial judge, and his ruling will not be revised on appeal unless it clearly appears that such discretion has been abused.'" Grimsley v. State, 678 So.2d 1197, 1206
(Ala.Crim.App. 1996) (quoting Free v. State, 495 So.2d 1147, 1157
(Ala.Crim.App. 1986)).
In Maples v. State, 758 So.2d 1 (Ala.Crim.App.), aff'd, 758 So.2d 81
(Ala. 1999), this Court stated:
 "When reviewing the challenged jury instructions, we bear in mind the following principles. A trial court has broad discretion in its formulation of jury instructions. Williams v. State, 611 So.2d 1119, 1123
(Ala.Cr.App. 1992). When reviewing a trial court's instructions, "`he court's charge must be taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together.'" Self v. State, 620 So.2d 110, 113 (Ala.Cr.App. 1992) (quoting Porter v. State, 520 So.2d 235, 237 (Ala.Cr.App. 1987)); see also Beard v. State, 612 So.2d 1335 (Ala.Cr.App. 1992); Alexander v. State, 601 So.2d 1130 (Ala.Cr.App. 1992)."
758 So.2d at 65.
At the conclusion of closing arguments, the trial judge made the remark Baird complains of on appeal.
 "Ladies and gentlemen, it has been a long day. The next phase that I will give you is the Court's oral charge, and then I will let you go back to the jury room, select your foreperson, and then begin your deliberations. As I stated to you previously, this next phase will be divided into two parts. When you go back the first time, you are not to consider the punishment phase of this trial. The first time you go back there, after I give you the Court's oral charge, you decide what, if any, charges the defendant is guilty of. Once you have done that, you will come and announce that charge in the courtroom, then we can go to the second phase after that, depending upon what your verdict is in this *Page 248 
case. Now, the Court's oral charges that I will give you are going to take longer than an hour. So I will not do it this afternoon. . . . We'll start at 8:00. I will give you the charge, let you go back to the jury room and work only on the guilt phase; decide whether or not this defendant is guilty beyond a reasonable doubt of the charges that will be explained to you tomorrow."
(R. 796-97.)
Baird moved for a mistrial on the grounds that the instruction was prejudicial and that it was couched in terms of guilt, with no mention of innocence. Trial counsel for Baird also argued that the remark implied that the trial judge believed Baird to be guilty, and that the jury should return a guilty verdict. The trial judge denied Baird's motion for a mistrial.
The trial judge's comment, viewed in context, was not improper. The trial judge did not instruct the jury to find Baird guilty of any offense, and did not imply that the jury should return a guilty verdict. Additionally, the trial judge, in her jury charge the following day, thoroughly instructed the jury that she had no opinion about Baird's guilt or innocence, and that the jury should not infer anything from comments that she had made or from any ruling that she made during the course of the trial. We find no reversible error in the trial judge's remarks or in the jury instruction. See Allen v. State, 683 So.2d 38, 43
(Ala.Crim.App. 1996) (trial judge's use of certain language, including the word "victim", describing burden of proof as "simply" reasonable doubt, and use of phrase "prima facie case" without further explanation, not prejudicial when jury charge viewed as a whole). Therefore, Baird is not entitled to relief on this claim.
 X.
Baird also argues that the indictment was multiplicitous and resulted in double jeopardy.
The indictment against Baird contained two counts and read as follows:
 "The grand jury of said county charge that, before the finding of this indictment,
 "MICHAEL RAY BAIRD, whose name is to the grand jury otherwise unknown, did intentionally cause the death of JOYCE C. LAMASTUS by shooting her with a pistol and did intentionally cause the death of RICKY GLENN LAMASTUS, by shooting him with a pistol, in violation of Section 13A-5-40(a)(10) of the Alabama Criminal Code, against the peace and dignity of the State of Alabama.
 "2nd: The grand jury of said county further charge that before the finding of this indictment, MICHAEL RAY BAIRD, whose name is to the grand jury otherwise unknown, did intentionally cause the death of JOYCE C. LAMASTUS by shooting her with a pistol and MICHAEL RAY BAIRD, caused said death during the time that MICHAEL RAY BAIRD, was in the course of committing a theft of one lady's purse, three prescription drugs in bottles and $700.00 of the lawful currency of the United States of America, the property of JOYCE C. LAMASTUS, by the use of force against the person of JOYCE C. LAMASTUS or against the person of another present, RICKY GLENN LAMASTUS, with intent to overcome his physical resistance or physical power of resistance, while the said MICHAEL RAY BAIRD, was armed with a deadly weapon, a pistol, in violation of Section 13A-5-40(a)(2) of the Alabama Criminal Code, against the *Page 249 
peace and dignity of the State of Alabama."
(C. 24.)
"An indictment is multiplicitous if a single offense is charged in more than one count." Dorsey v. State, [Ms. CR-97-1522, May 25, 2001] ___ So.2d ___, ___ (Ala.Crim.App. 2001), citing Borden v. State, 711 So.2d 498
(Ala.Crim.App. 1997), aff'd, 711 So.2d 506 (Ala. 1998). Counts I and II of the indictment returned against Baird were not multiplicitous.
As this Court stated in Williams v. State, 710 So.2d 1276
(Ala.Crim.App. 1996), aff'd, 710 So.2d 1350 (Ala. 1997):
 "In regard to the double jeopardy argument, one indictment charged the appellant with the intentional killing of four persons — Gerald Paravicini, Freddie Barber, Linda Barber, and Bryan Barber, a violation of § 13A-5-40(a)(10) [Ala. Code 1975]; and the other capital indictment charged him with the murder of Linda Barber and Freddie Barber during the course of a robbery in the first degree, a violation of § 13A-5-40(a)(2). Both indictments are based partly on the same act: the intentional killing of Linda and Freddie Barber. However, the test in determining whether the charges run afoul of the Double Jeopardy Clause is whether each crime contains a statutory element not contained in the other. Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932); see also United States v. Dixon, 509 U.S. 688, 113 S.Ct. 2849, 125 L.Ed.2d 556
(1993) (a plurality of the United States Supreme Court reaffirmed the Blockburger test as the sole criterion for judging double jeopardy claims); Seritt v. State, 647 So.2d 1 (Ala.Cr.App.), cert. denied, 647 So.2d 1
[(Ala. 1994)]. In this case, each capital offense charged required proof of an element that the other did not. Proof of the murder-robbery charge required proof of a robbery in the first degree, which the multiple murder charge did not require. Proof of the multiple murder charge required proof of more than one murder, which the capital murder offense of murder of two or more persons did not require. We therefore conclude that under the Blockburger test, the appellant was properly indicted and convicted for two separate and distinct capital offenses `notwithstanding a substantial overlap in the proof offered to establish the crimes,' Iannelli v. United States, 420 U.S. 770, 785 n. 17, 95 S.Ct. 1284, 1293
n. 17, 43 L.Ed.2d 616 (1975); Jackson v. State, 516 So.2d 726, 761 (Ala.Cr.App. 1985), rem'd on other grounds, 516 So.2d 768 (Ala. 1986). Therefore, the charges were not multiplicitous and the appellant's convictions for both offenses did not violate the Double Jeopardy Clause."
710 So.2d at 1321.
Here, Baird was charged with two capital offenses. Both counts are based partially on the same act: the intentional killing of Joyce Lamastus and Ricky Lamastus. As in Williams, supra, Count I required proof of two murders, which the capital offense of murder during a robbery in the first degree did not require. Count II of the indictment required proof of a first-degree robbery, which the capital offense of murder of two or more persons did not require. Baird was properly indicted for separate and distinct offenses. Therefore, the indictment was not multiplicitous and did not subject Baird to double jeopardy.
There were two victims and Baird's convictions on two counts of murder do not violate the Double Jeopardy Clause. *Page 250 
Because his claim is without merit, Baird is not entitled to any relief.
 XI.
Finally, Baird argues that the trial court erroneously denied his motion for a judgment of acquittal. Specifically, "Baird asserts that the video confession and statement are the only evidence sufficient to convict him for the deaths of Joyce and Ricky Lamastus. With the suppression of these, there was inadequate evidence to submit the charges to the jury and that an acquittal is due." (Baird's brief, p. 47.)
The Alabama Supreme Court addressed the appellate court's role in reviewing the sufficiency of the evidence in criminal cases in Ex parteWoodall, 730 So.2d 652 (Ala. 1998):
 "`In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution. Faircloth v. State, 471 So.2d 485
(Ala.Cr.App. 1984), aff'd, 471 So.2d 493 (Ala. 1985).' Powe v. State, 597 So.2d 721, 724 (Ala. 1991). It is not the function of this Court to decide whether the evidence is believable beyond a reasonable doubt, Pennington v. State, 421 So.2d 1361 (Ala.Cr.App. 1982); rather, the function of this Court is to determine whether there is legal evidence from which a rational finder of fact could have, by fair inference, found the defendant guilty beyond a reasonable doubt. Davis v. State, 598 So.2d 1054
(Ala.Cr.App. 1992). Thus, `[t]he role of appellate courts is not to say what the facts are. [Their role] is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury.' Ex parte Bankston, 358 So.2d 1040, 1042 (Ala. 1978) (emphasis original)."
730 So.2d at 658.
Section 13A-6-2(a)(1), Ala. Code 1975, provides that a person commits intentional murder if, "[w]ith intent to cause the death of another person, he causes the death of that person or of another person." Section13A-6-2(a)(3), Ala. Code 1975, provides that a person commits felony-murder if:
 "He commits or attempts to commit . . . robbery in any degree . . . and, in the course of and in furtherance of the crime that he is committing or attempting to commit, or in immediate flight therefrom, he, or another participant if there be any, causes the death of any person."
The evidence, viewed in a light most favorable to the prosecution, if believed by the jury, showed that Baird threatened to kill Ricky and Joyce Lamastus the day of the murders. There was evidence indicating that Baird actually went to the Lamastuses's residence and brandished a gun the day before the murders. Ricky Lamastus filed a complaint against Baird on the day of the murders, alleging that Baird had threatened to kill him and his wife. Baird was arrested for driving under the influence later that evening. A gun with six empty cartridges and Joyce Lamastus's prescription bottles, and other items belonging to Joyce Lamastus were discovered in Baird's vehicle. Two witnesses testified that Baird took measures while in jail to attempt to dispose of his clothing. Baird confessed to killing Ricky and Joyce Lamastus.
We have found that the video confession and statement were properly admitted. That evidence, combined with the other testimony presented by the State, was legally sufficient to submit the case to the jury. Baird is not entitled to any relief because this claim is without merit. *Page 251 
For the above-stated reasons, the judgment of the trial court is due to be affirmed.
AFFIRMED.
McMillan, P.J., and Baschab, Shaw, and Wise, JJ., concur.
[1] Baird had been indicted for two counts of capital murder, under § 13A-5-40(a)(2) and (a)(10), Ala. Code 1975. The jury found him guilty of the aforementioned lesser-included offenses.
[2] Although the exact date of the murders was uncertain, the prosecution contended that the murders occurred some time in the afternoon of Friday, October 2, 1998; i.e. the time between when the Lamastuses were last seen and when Baird was arrested for driving under the influence.
[3] This same witness also testified that, because she could not reach Ricky or Joyce Lamastus by telephone on Friday or Saturday, she went to their residence on Sunday, October 4, 1998, to check on them. She discovered the bodies that morning.
[4] Dr. Robert Brissie performed the autopsies on Ricky and Joyce Lamastus on October 5, 1998, and determined that the Lamastuses had been dead between approximately one and a half and three days.
[5] The tapes were essentially the same except that the audiotape recorded a few additional minutes after the videotape ran out of tape.
[6] Jacob Fowler, who shared a cell with Baird in jail, testified in front of the jury that Baird was drunk when he was brought in. Fowler also testified that Baird told him that "he took Xanax and a couple of other pills. . . . I think he said Valium and a couple of others." (R. 290-91.)